**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

FISHERMEN'S FINEST INC; US
FISHING LLC; NORTH PACIFIC
FISHING INC,
              *Plaintiffs-Appellants,*

              v.

GARY LOCKE,* as he is the
Secretary of the United States
Department of Commerce,
              *Defendant-Appellee.*

No. 08-36024

D.C. No.
2:07-cv-01574-MJP

OPINION

Appeal from the United States District Court
for the Western District of Washington
Marsha J. Pechman, District Judge, Presiding

Argued and Submitted
November 6, 2009—Seattle, Washington

Filed January 19, 2010

Before: Arthur L. Alarcón, Andrew J. Kleinfeld and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Alarcón;
Dissent by Judge Clifton

---

*Gary Locke is substituted for his predecessor as Secretary of the
United States Department of Commerce. Fed. R. App. P. 43(c)(2).

## COUNSEL

Linda R. Larson, Marten Law Group PLLC, Spokane, Washington, for the plaintiffs-appellants.

Charles R. Scott, United States Department of Justice, Environment & Natural Resources Division, Washington, D.C., for the the defendant-appellee.

## OPINION

ALARCÓN, Senior Circuit Judge:

Fishermen's Finest, Inc., North Pacific Fishing, Inc., and U.S. Fishing, LLC, ("Fishermen's") appeal from the district court's order granting summary judgment in favor of the Secretary of the United States Department of Commerce. Fishermen's challenges the Secretary's issuance of a final rule adopting Amendment 85 ("A85") to the Fishery Management Plan ("FMP") for Groundfish of the Bering Sea and Aleutian Islands Management Area ("BSAIMA").

The Government allocates Pacific cod in the BSAIMA among different sectors of the fishing industry. Fishermen's belongs to the trawl Catcher / Processor ("CP") sector. It contends that the most recent allocation, which reduced its share of the Pacific cod fishery, did not comport with applicable law.

We affirm because we agree with the district court that the Secretary did not act arbitrarily and capriciously in adopting Amendment A85.

# I

Fishermen's operates two medium-sized vessels that fish for Pacific cod, flatfish, rockfish and Atka mackerel in the BSAIMA. The BSAIMA fishery is located off the northwest coast of Alaska. It is this nation's largest in terms of harvest and area. Pollock is the most lucrative and largest fishery in the BSAIMA; Pacific cod is second. Different means of fishing are employed in the BSAIMA. Allocations are made among different methods of fishing, because of their individualized environmental and socioeconomic impact. A trawler is a fishing vessel that fishes by dragging a large net or trawl through the water. CP vessels process fish by removing the head and gut as soon as they are caught, hence Fishermen's belongs to a sector colloquially known as the "Head & Gut" sector.

# A

To understand the substance of Fishermen's claims requires an overview of the Government's regulation of fishing. Finding that "[c]ertain stocks of fish have declined to the point where their survival is threatened," 16 U.S.C. § 1801(a)(2)(A), Congress enacted the Magnuson-Stevens Fishery Conservation and Management Act ("MSA") in 1976 to "conserve and manage fishery resources" and to "achieve and maintain, on a continuing basis, the optimum yield from

each fishery." *Id*. § 1801(b)(1) & (4). In order to achieve these ends the MSA established eight regional Fishery Management Councils ("Councils"), which could set the Total Allowable Catch ("TAC") for each fish species in different fishing zones. *See id.* §§ 1852(b) & (c), 1801(b)(5); 1852(h)(1). The FMP's, and amendments thereto, do not become effective, however, until they are approved by the Secretary. *See* 16 U.S.C. §§ 1854(a)-(b), 1855. The Secretary has delegated this responsibility to the National Marine Fisheries Service ("NMFS"), which only promulgates the regulation after ensuring the FMP's and amendments are consistent with the MSA's ten National Standards, *inter alia*, 16 U.S.C. § 1854(a)-(b), and after a period of public comment. *Id*. §§ 1854(a)(1)(B) & (b)(1)(A).

Fishermen's complains that the most recent allocations of the Pacific cod TAC in amendment A85 to the current FMP of the BSAIMA violated National Standard 2 and National Standard 4 of the MSA. National Standards 2 and 4 provide that:

> (2) Conservation and management measures shall be based upon the best scientific information available.
>
> . . .
>
> (4) Conservation and management measures shall not discriminate between residents of different states. If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such a manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges.

16 U.S.C. § 1851(a)(2) & (4). The MSA requires the NMFS to promulgate guidelines interpreting the National Standards.

*Id.* at § 1851(b). According to the guidelines, National Standard 2 "best scientific information" "includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1) (2006). Further, FMPs and amendments must "take into account" the "best scientific information available at the time of preparation" and if new information becomes available between initial drafting and NMFS review, it "should be incorporated into the final FMP where practicable." *Id.* § 600.315(b). Where there are conflicting facts and opinions, the Fishery Management Councils may choose what to consider "but should justify the choice." *Id.* § 600.315(b)(1).

With regards to National Standard 4, allocations are "fair and equitable" if they are "rationally connected to the achievement of [optimum yield] or with the furtherance of a legitimate FMP objective." *Id.* § 600.325(c)(3)(i)(A). Further, "[i]nherent in an allocation is the advantaging of one group to the detriment of another." *Id.* Thus, "[a]n allocation of fishing privileges may impose a hardship on one group if it is outweighed by the total benefits received by another group or groups." *Id.* § 600.325(c)(3)(i)(B). For example, section 305 of the MSA sets aside a portion of TAC for eligible villages as part of the Western Alaska Community Development Quota Program. *See* 16 U.S.C. § 1855(i)(1)(A).

Fishermen's also argues that A85's TAC allocation violates 211(a) of the American Fisheries Act ("AFA") by creating an "adverse impact" on non-AFA fishing vessels. In 1998, the AFA created a monopoly in fishing rights to pollock assigned to specific vessels that met a past participation test in that industry. AFA § 208. Fishermen's does not belong to this group. It is referred to as a non-AFA participant in BSAIMA fishing. The vessels granted a monopoly by the AFA operate as cooperatives that also engage in fishing for other species, as was anticipated and approved of by the AFA. Because of the competitive advantage the specific AFA vessels gained

due to their pollock monopoly, Congress sought to limit their impact on other fisheries by dictating that Councils:

> shall recommend for approval by the Secretary such conservation and management measures as it determines necessary to protect other fisheries under its jurisdiction and the participants in those fisheries, including processors, from *adverse impacts* caused by this Act or fishery cooperatives in the directed pollock fishery.

AFA § 211(a) (emphasis added). Congress also built in protections in the AFA against unfair competitive advantages for the AFA vessels by imposing "sideboards," which are limits on how much fish of other species AFA vessels are allowed to catch. AFA § 211(b)(2) & (C). For example, in the Pacific cod fishery, AFA trawl CP vessels operated under a sideboard limit of 6.1% of TAC and AFA trawl CV vessels operated under a sideboard limit of 20.2% of TAC. As a result of the AFA, non-AFA vessels increased their harvest of non-pollock species, as they were now excluded from pollock. A80 Final Rule, 72 Fed. Reg. at 52, 668.

**B**

An FMP for the BSAIMA was first promulgated in 1981. 46 Fed. Reg. 63, 295 (Dec. 31, 1981). It includes annual TACs for each of seventeen target species, including Pacific cod. In 1994, for the first time, Amendment 24 allocated the Pacific cod TAC, 44% to the "fixed gear" (hook-and-line and pot) sector, 54% to the trawl sector, and 2% to the jig gear sector (fishing lure methods). 59 Fed. Reg. 4009, 4010 (Jan. 28, 1994). These allocations reflected the harvests in those sectors from 1991 to 1993, with the exception that the jig gear's allocations was increased to encourage growth. Amendment 24 also gave the NMFS authority to "reallocate Pacific cod from vessels [from one sector to another] anytime . . . the [NMFS] determines that one gear group or the other

will not be able to harvest its allocation of Pacific cod." 59 Fed. Reg. at 4010.

In 1997, Amendment 46 divided the trawl allocation between catcher vessels ("CV") and catcher-processors ("CP") and allocated 51% to fixed gear, 47% to trawl gear (divided equally), and 2% for jig gear. 61 Fed. Reg. 59029 (Nov. 20, 1996)(codified at 50 C.F.R. pt. 679). Amendments 64 and 77, passed in 2000 and 2003, respectively, further refined sector subdivisions from the original fixed gear sector into five groups. *See* 65 Fed. Reg. 51553 (Aug. 24, 2000)(codified at 50 C.F.R. pt. 679); 68 Fed. Reg. 49416 (Aug. 18, 2003)(codified at 50 C.F.R. pt. 679). These amendments did not alter the TAC allocated to the trawl CP group. *See* 72 Fed. Reg. 5654, 5655 (February 7, 2007) (proposed rule) (noting a 23.5% TAC quota for trawl CPs between 1997 and A85).

On September 4, 2007, the NMFS updated the FMP for groundfish of the BSAIMA with Amendment 85, which sets forth new allocations for the TAC of Pacific cod that each of nine sectors may catch annually. Fisheries of the Executive Economic Zone Off Alaska, Pacific Cod Allocations in the Bering Sea and Aleutian Island Management Area, 72 Fed. Reg. 50788 (September 4, 2007) (codified at 50 C.F.R. pt. 679). For the first time since the MSA, trawl CPs were divided between AFA trawl catcher processors (part of the fleet granted pollock fishing rights under the AFA) and non-AFA trawl catcher processors (those who had no pollock fishing rights). 72 Fed. Reg. at 50788. Because AFA trawl CP vessels were now limited in their amount of Pacific cod by a direct allocation, there was no longer a need for the 6.1% sideboard limit imposed by the AFA. The sideboard was phased out.

The North Pacific Council, which has authority over the BSAIMA, sought the adoption of A85 because "[g]rowing demand for Pacific cod, a fully exploited fishery, and other

distributional concerns among sectors led the Council to consider a[n] . . . action to revise allocations of Pacific cod among the many BSAI[MA] groundfish sectors." 72 Fed. Reg. at 5657. Revision of allocations had become necessary because current allocations meant that "one or more sectors are typically unable to harvest their annual allocation of the Pacific cod TAC." 72 Fed. Reg. at 5655. "Thus, to provide an opportunity for the full harvest of BSAI Pacific cod non-CDQ TAC, existing allocations of Pacific cod that are projected to be unharvested by some sectors are annually reallocated by NMFS to other sectors." *Id.* "Since BSAI Pacific cod sector allocations have been in effect, NMFS has reallocated Pacific cod each year from the trawl and jig sectors to fixed gear sectors." *Id.*; *See also* Fishery Management Council, Public Review Draft: Environmental Assessment/Regulatory Impact Review/Initial Regulatory Flexibility Analysis for Proposed Amendment 85 iii-iv and Table E-1 (March 12, 2006) (hereinafter "EA/RIR/IRFA") (noting that between 2000 and 2004, trawl CPs reallocated 19% of their sector's quota). The NMFS also carried out other more minor reallocations. *Id.*

The problem statement setting forth the objectives of A85 reads as follows:

> The BSAIMA Pacific cod fishery is fully utilized and has been allocated among gear groups and to sectors within gear groups. The current allocations among trawl, jig, and fixed gear were implemented in 1997 (Amendment 46) and the CDQ [Community Development Quota] allocation was implemented in 1998. These allocations are overdue for review. Harvest patterns have varied significantly among the sectors resulting in annual in-season re-allocations of TAC. As a result, the current allocations do not correspond with actual dependency and use by sectors.

> Participants in the BSAIMA Pacific cod fishery who have made significant investments and have

long-term dependence on the resource need stability in the allocations to the trawl, jig, fixed gear and CDQ sectors. To reduce uncertainty and provide stability, allocations should be adjusted to better reflect historic use by sector. The basis for determining sector allocations will be catch history as well as consideration of socio-economic and community factors.

As other fisheries in the BSAIMA and GOA are incrementally rationalized, historical participants in the BSAIMA Pacific cod fishery may be put at a disadvantage. Each sector in the BSAIMA Pacific cod fishery currently has different degrees of license requirements and levels of participation. Allocations to the sector level are a necessary step on the path towards comprehensive rationalization. Prompt action is needed to maintain stability in the BSAIMA Pacific cod fisheries.

72 Fed. Reg. at 5657. In pursuing socioeconomic factors, the North Pacific Council stated that it was particularly interested in expanding entry-level, local opportunities to fish cod for coastal Alaskan communities that may be under-represented due to the high fixed cost barrier to entry present in other fishing methods. *Id.*

The Council aimed to allocate Pacific cod based on the average of catch history. The pre-A85 and post-A85 allocations can be summarized as follows (all numbers are a percentage of TAC):

| SECTOR | Pre-A85 | A85 | Average Retained Harvest (1995-2003) | Recent Average Retained Harvest (2000-2003) |
|---|---|---|---|---|
| Jig | 2.0 | 1.4 | 0.1 | 0.1 |
| Hook-and-line/pot-CV | 0.7 | 2.0 | 0.4 | 0.7 |
| Hook-and-line CP | 40.8 | 48.7 | 49.1 | 49.4 |
| Pot CV (60 ft +) | 7.6 | 8.4 | 8.6 | 9.0 |
| **AFA Trawl CP** | 23.5 | 2.3 | 2.2 | 1.5 |
| **Non-AFA Trawl CP** | | 13.4 | 13.4 | 16.0 |
| Trawl CV | 23.5 | 22.1 | 24.0 | 21.6 |

72 Fed. Reg. at 5659, Table 3: Current and Proposed Allocations of BSAIMA Pacific cod non-CDQ TAC and Average Harvest Share by Sector (percent) (emphasis added). When it began its analysis in 2003, the Council considered alternative options for the data that should be used in determining the historical catch. The Council selected the most expansive set of years, choosing to analyze catch history data from 1995, when allocations began, to 2003. In April 2006, the Council voted to take final action and propose new sector allocations, including providing the non-AFA trawl CP sector with a 13.4% share of the TAC. Fishermen's points out that these allocations have a significant financial impact on fisheries as each percent of the TAC allocated represents approximately $2 million in revenue.

By that time further catch history data from 2004 and 2005 was available. The non-AFA trawl CP sector had an average of 17.7 percent of the retained harvest between 2004 and 2005. 72 Fed. Reg. at 5660, Table 4: Average Share (percent)

of Retained Harvest 2004-2005. Whereas the data from 1995 to 2003 was processed based on fish tickets, which issue only upon sale or transfer of fish, the 2004 and 2005 data was extrapolated from observer estimates. Further, observer coverage varied between sectors. *Id.*

The Council disregarded the 2004 and 2005 data because it considered it inequitable to favor the trawl CP sector, which in response to high market demand for Pacific cod and in anticipation of A85's evaluation of usage, had been able, thanks to its prior over-allocation, to increase steadily its Pacific cod fishing, while other sectors which suffered from under-allocation, remained limited to smaller usage. Thus, the Council "considered [the 2004-2005] data . . . to illustrate recent harvest trends," but did not rely upon them in establishing allocations.

Consistent with the problem statement, the Council allocated higher than the average historical catch to those sectors that would most benefit coastal Alaskan communities: the small fixed gear sector, 77% of which is comprised of residents of coastal Alaskan communities, and the jig sector, which uses coastal processing facilities. In justifying the non-AFA trawl CP sector's allocation, the Council also noted that the trawl sectors had never "funded" allocation increases for the entry-level small fixed gear CV sector above its historic average, that CV sectors contribute more to the economy of coastal communities than CP sectors (because of onshore processing), and that CV sectors had suffered greater impacts from restrictions to protect Stellar sea lions.

Re-allocations also occurred based on the need to preserve a "directed cod" fishery for various sectors. The term "directed" fishery refers to whether vessels intend to catch that particular species of fish or whether the fish is caught incidentally. Fish caught incidentally are known as "bycatch." Vessels previously would discard the dead or dying bycatch back into the sea although some were kept for sale. Because

of the waste and detrimental environmental effects of this practice, MSA National Standard 9 requires that bycatch be minimized. 16 U.S.C. § 1851(a)(9). Accordingly, in 1997, the NMFS required vessels to retain all, or specified amounts of, pollock and Pacific cod, by adopting Amendment 49 for the BSAIMA FMP. 62 Fed. Reg. 63, 880, 63, 890 (Dec. 3, 1997) (codified at 50 C.F.R. § 679.27). In proposing A85, the Council sought to allocate enough Pacific cod TAC to the AFA trawl CP sector so it could maintain the "minimum necessary" for a directed Pacific cod fishery. The Council was motivated by the fact that the AFA trawl CP sector was efficient in its Pacific cod fishing, with a higher percentage of its allocation being used up by directed fishing. The Council also made the decision to favor those with less bycatch by counting pre-1997 historical catch data even though that data did not include bycatch.

Fishermen's contends that the North Pacific Council allocated Pacific cod TAC to the AFA trawl CP sector as part of an impermissible and arbitrary political compromise in order to ensure that one sole vessel of that fleet, the *Katie Ann*, had a directed cod fishery. Councilman Fuglvog expressed concern about whether the AFA trawl CP sector allocation would be sufficient to allow the *Katie Ann* to continue its directed cod fishery. In response, Councilwoman Salveson stated that "this action is intended to . . . establish allocation to better reflect historic use by sector . . . not to provide for a directed fishery for any one vessel." Final allocations to the AFA trawl CP sector were within the range calculated based on historic use.

On February 7, 2007, the NMFS published its proposed rule and request for comments. 72 Fed. Reg. at 5654. On September 4, 2007, it promulgated its final rule and published the comments and responses. 72 Fed. Reg. at 50788. There were numerous comments addressing the allocation of cod to non-AFA trawl CPs. *See, e.g.*, 72 Fed. Reg. at 50793 (Comment

3), 50795 (Comments 6 and 9), 50796 (Comment 11), 50798 (Comment 16).

On October 4, 2007, Fishermen's filed this action in federal court challenging A85 under the judicial review powers over regulations promulgated under the MSA, including FMPs, granted by the APA. 16 U.S.C. § 1855(f)(1) & (2). The district court upheld Secretary's decision in a summary judgment order on December 5, 2008. It held that (1) A85's allocations were rationally connected to the objectives set forth in the problem statement and resulted in a fair and equitable result as required by National Standard 4; (2) the inclusion of the 1995-1997 years and exclusion of the 2004-2005 years in calculating historical catch data was not a failure to consider the best scientific information available under National Standard 2; (3) the allocation to the AFA trawl CP sector was not a political compromise merely for the benefit of the *Katie Ann*; and (4) the allocations did not create an adverse impact in violation of the AFA by robbing the non-AFA trawl CP sector to benefit the AFA trawl CP sector. Fishermen's has timely appealed. This Court has jurisdiction under 28 U.S.C. §§ 1291and 1294(1).

## II

## A

Fishermen's contends that the Secretary violated National Standard 2 and National Standard 4 in promulgating A85. Further, Fishermen's contends that A85 creates an adverse impact on non-AFA vessels in violation of the AFA.

"This Court reviews a district court's decision to grant summary judgment *de novo* with all facts read in the light most favorable to the non-moving party." *Yakutat, Inc. v. Gutierrez*, 407 F.3d 1054, 1066 (9th Cir. 2005)(*quoting Covington v. Jefferson County*, 358 F.3d 626, 641 n.22 (9th Cir. 2004)). In reviewing regulations promulgated under the

Magnuson Act, "our only function is to determine whether the Secretary [of Commerce] 'has considered the relevant factors and articulated a rational connection between the facts found and the choice made.' " *Alliance Against IFQs v. Brown*, 84 F.3d 343, 345 (9th Cir. 1996) (*quoting Wash. Crab Producers, Inc. v. Mosbacher*, 924 F.2d 1438, 1440-41) (9th Cir. 1990)). "We determine only if the Secretary acted in an arbitrary and capricious manner in promulgating such regulations." *Alliance Against IFQs*, 84 F.3d at 345. "Under the APA, we will reverse the agency action only if the action is arbitrary, capricious, an abuse of discretion, or otherwise contrary to law." *Lands Council v. Powell,* 379 F.3d 738, 743 (9th Cir. 2004), amended by 395 F.3d 1019 (9th Cir. 2005).

**B**

**[1]** To be valid A85 must be consistent with the National Standards presented in the Magnuson-Stevens Act. 16 U.S.C. § 1854; *see Yakutat*, 407 F.3d at 1058 (The Fishery Management Plans . . . must be consistent with the "national standards" described in the Magnuson Act."). The regulations implementing National Standard 4 require that motives for new allocations be "justified in terms of the objectives of the FMP." 50 C.F.R. § 600.325(c)(3)(i)(A). Fishermen's argues that, because A85 reduces the non-AFA trawl CP allocation below Fishermen's definition of "historical use," the changed quota fails to meet the stated objectives. Fishermen's contrasts the problem statement, which points out that pre-A85 allocations did not reflect "actual dependency and use," with the new regulations that reduce their share below their actual average usage in 2004 and 2005. 72 Fed. Reg. at 5657. Fishermen's narrowly focuses on this one clause at the expense of a more comprehensive, coherent reading of the entire statement. While the final problem statement does begin describing, among other concerns, a discrepancy between allocations and actual use, it specifically provides that the basis for future allocations "will be catch history" and other socioeconomic considerations. 72 Fed. Reg. at 5657. Fishermen's was allo-

cated an annual TAC that was the average of their historic usage of Pacific cod from 1995 to 2003. In terms of socioeconomic and community factors, their share was reduced in part to fund the entry-level small fixed gear sector of coastal Alaskan residents.

[2] Fishermen's also attempts a novel combination of National Standard 4 of the MSA with 211(a) of the AFA. Fishermen's points out that National Standard 4 forbids excessive privileges to one group while 211(a) forbids adverse impacts caused by any unfair advantages to the AFA vessels. Fishermen's then would have us conclude that A85, by shifting percentage points in its final allocation from the non-AFA trawl CP sector to the AFA trawl CP sector, violated both. The Council, however, may under National Standard 4, "impose a hardship on one group if its outweighed by the total benefits received by another group or groups." *Id.* § 600.325(c)(3)(i)(B). As noted above, part of the reduction was due to socioeconomic factors leading the Council to fund sectors that favor growth for coastal Alaskan residents. Further, whatever shift in percentage points that could be "traced" from the non-AFA trawl CP sector to the AFA trawl CP sector was rationally justified by the need to preserve the more efficient directed cod fishery of the latter. As for 211(a), we discuss it separately and do not believe there is any statutory confluence that requires special treatment of 211(a) with National Standard 4.

Fishermen's attempts to combine the requirements of AFA 211(a) with National Standard 4, by claiming the NMFS was required to analyze specifically any adverse impact A85 would have on the non-AFA trawl CP sector caused by benefitting the AFA trawl CP sector. As explained below, however, if anything, A85 had an adverse impact on the AFA trawl CP sector, thus, there can be no reasonable expectation that the NMFS should analyse a non-existent harm.

[3] Fishermen's has failed to demonstrate that the allocation, although disadvantageous to them, was not fair or equi-

table in furthering the beneficial objectives of the FMP. Thus, A85 comports with National Standard 4.

**[4]** Fishermen's makes a related argument that the NMFS failed to analyze the impact of the allocations under National Standard 4 by failing to consider its "potential" loss of a directed cod fishery. The regulations state that "the Council should make an initial estimate of the relative benefits and hardships imposed by the allocation." 50 C.F.R. § 600.325(c)(3)(i)(B). However, the EA/RIR/IFRA demonstrates that the Council did consider the impact of the changes on the non-AFA trawl CP sector. For example, the Council considered the extent limitations on bycatch would prevent a direct cod fishery for the trawl sector, and noted that separate allowances would prevent the non-AFA trawl sector from closing down directed cod fishing for the entire trawl sector. Further, the responses to the comments published with the final rule show that the NMFS determined that, even under a "worst case scenario," the non-AFA trawl CP sector would be able to maintain a directed cod fishery. *See* 72 Fed. Reg. at 50799, 50801. The National Standards do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis. There is nothing in the MSA that guarantees Fishermen's a directed cod fishery. Fishermen's is to a certain extent a victim of its own success, because the greater its operations for other fish species, inevitably the greater its incidental bycatch of Pacific cod. One of the BSAIMA FMP's objectives under the MSA is "conservation and management." Accordingly, under National Standard 9, the FMPs, and the amendments thereto, must minimize bycatch. The Council is not tied down by the need to allocate in order to preserve directed cod fisheries for participants with high levels of bycatch. The Council fulfilled its obligations under the framework by analyzing the impact of the new allocations on the non-AFA trawl CP sector. Thus, none of the Secretary's actions on this issue were arbitrary or capricious. *Alliance Against IFQs*, 84 F. 3d at 345.

## C

**[5]** Under National Standard 2, conservation and management measures "shall be based upon the best scientific information available," 16 U.S.C. § 1851(a)(2), which, "includes, but is not limited to, information of a biological, ecological, economic, or social nature." 50 C.F.R. § 600.315(b)(1). Fishermen's argues that the Council failed to consider the most relevant data in developing the new allocations. Fishermen's asserts that the Council considered data that was too old and no longer relevant to reallocation information, and failed to consider the relevance of the most recent available data. Fishermen's further argues that instead of basing the decision on "scientific analysis" it was an "arbitrary political compromise."

**[6]** Fishermen's maintains that the older catch history data analyzed by the Council was irrelevant. They argue that any data collected before 1998 is particularly misleading because catch regulations changed in 1998. In support, Fishermen's point out that in A80, a concurrent amendment designed to reorganize all species fishing in the BSAIMA, pre-1998 data was ignored because there was a concern the data would fail to best "represent the traditional harvest patterns of the [A]80 sector." 72 Fed. Reg. at 52688 (A80 Final Rule). The Council, however, stated its rationale for including the older data in A85. The year of 1995 was selected as a starting point because it immediately followed the first Magnuson-Stevens Act allocations. The Council acknowledged that there were intervening events that may have changed the circumstances of the allocations, in particular the 1998 AFA legislation and 2001 attempts to protect the Steller sea lion. For example, the passing of the AFA legislation pushed the non-AFA trawl sector into increased cod fishing. The AFA, however, pushed all non-AFA Pacific cod participants into increased Pacific cod use, not just Fishermen's. The key difference is that because Fishermen's belonged to a sector with one of the most significant over-allocations prior to A85, it was one of

the few who could increase its usage without being limited by its allocation in response to the AFA. If the Council focused exclusively on post 1999 data, it would benefit Fishermen's unfairly while ignoring long-term harvest trends for the industry as a whole not just Fishermen's sector.

**[7]** Further, the data Fishermen's disputed was not the only National Standard 2 data the Council was allowed to rely on in making its decision, considering the objectives of the FMP. The Council also made reallocations based on sociological data, which pointed towards increasing allocations to the small gear sector that consisted mainly of coastal Alaskan residents.

**[8]** Finally, it is evident that the Council examined several potential data sets before selecting the range including 1995 to 1998. Even with regards to the selection of the years in question, the Council determined that a smaller set of years would produce skewed results based on a too narrow view of market demand for cod in those years. In other words, although the AFA legislation and Stellar sea lion protection measures were significant variables that did threaten to render pre-1998 data misleading, the Council "justified its choice," as required by 50 C.F.R. § 600.315(b)(1), to include the pre-1998 data because it believed a host of other variables were influencing catch history and a more accurate representation could only be reached by broadening the set of years to include all years with comparable data since allocations began. Ultimately, any selection of data inherently places one party at a disadvantage; Fishermen's has failed to demonstrate how this selection of this data was arbitrary or capricious. The Council stated a permissible rationale for including pre-1998 data and nothing in the record of the Council's deliberations on this issue appears capricious or contrary to the evidence. *See Yakutat, Inc.*, 407 F.3d at 1067 (Council "drew a rational line" by omitting 1999 from analysis of which boats to include in Pacific cod fishery because those boats omitted as a result not dependent on that one species).

**D**

**[9]** Fishermen's argues that the Council failed adequately to consider data from the two most recent catch years (2004 and 2005). Fishermen's relies on the requirement that FMP's must incorporate new information as it becomes available where practicable. 50 C.F.R. § 600.315(b)(2). The Secretary concluded that, "[t]he Council and NMFS considered more recent (2004 and 2005) harvest data from the NMFS catch accounting database in reviewing harvest history to illustrate recent harvest trends as that information became available, but it was not available in the same format as the data from 1995 through 2003." *See* 72 Fed. Reg. at 50793-94 (Comment 3 and Response). For 1995 to 2003, the Council had data from Federal Weekly Production Reports and Alaska Department of Fish and Game fish tickets. The NMFS noted that using a set based on retained harvest from 1995-2003 was more accurate than using data from later years because the latter is based on observer estimates. 72 Fed. Reg. at 50793. To use observer data would be inequitable because certain sectors, such as the AFA trawl CP group, are observed more carefully than others who would have to rely on extrapolated data. *Id.* In fact, fish tickets only became available in raw data form for the 2004 and 2005 years in March 2006, a month prior to the Council issuing its proposed allocations. Given the time needed to process the information, and the fact that the Council's deliberations were coming to a close after more than two years, incorporating the new information was not "practicable" and so need not have been considered under National Standard 2. *See* 50 C.F.R. § 600.315(b) (if new information becomes available between initial drafting and NMFS review, it "should be incorporated into the final FMP *where practicable*.") (emphasis added).

The Secretary also contends that the Council did take into account data for 2004 and 2005, even if those numbers did not form the basis for the final historical catch numbers. As a review of the Secretarial Review Draft of A85 demonstrates,

data from 2004 and 2005 was analyzed. The Council noted that the non-AFA trawl CP sector had a harvest share in 2004 that was greater than any other year. *Id*. at 273. However, the NMFS noted that, despite this increase in harvest, the higher 2004 and 2005 numbers did not mean that the combined trawl CP sector was catching its entire allocation. 72 Fed. Reg. at 50794. In part, the Council discounted this recent data because of unusually high market demand for Pacific cod in those years, as well as "the likelihood of competition for Pacific cod among sectors in anticipation of this action." Because of its prior over-allocation, Fishermen's belonged to a sector that could increase its usage in response to these incentives, unlike other sectors. The Secretary provided a rational explanation for the Council's action: the Council did not wish to reward Fishermen's sector for their prior over-allocation by perpetuating it while telling the other sectors they did not need bigger allocations because they had maximized their current allocations.

[10] The record shows that the Council also considered the best available sociological data, which indicated that TAC percentage needed to be subtracted from other sectors to benefit the coastal Alaskan communities. The need to maintain consistency in data and treat all sectors equally is an ample justification for using the 1995-2003 data. It was not practicable to include the 2004-2005 data. The Secretary's decision in this regard was neither arbitrary nor capricious.

### E

[11] Fishermen's point to the Council's treatment of the *Katie Ann*, an AFA trawl CP vessel, for the argument that inappropriate political considerations interfered with rational decision making. Regulations that are "a product of pure political compromise" in the absence of scientific justification will generally be viewed as arbitrary and capricious. *Midwater Trawlers Co-operative v. Dep't of Commerce*, 282 F.3d 710, 720-21 (9th Cir. 2002) (specific allocation of fishing

rights to Indian tribe not based on scientific rationale in violation of MSA). While the Council had considered allocating 1.5% of the TAC to the AFA trawl CP sector, they increased the quota to this sector to 2.3% based, in part, on the concern that the *Katie Ann* would not be able to maintain its directed cod fishery. In other words, absent an increased allocation, ships like the *Katie Ann* would only be able to catch cod as bycatch during their directed pollock fishery. A Council member noted there were "negotiations and discussions" that led to the increased allocation. Reading the record as a whole, it is clear that the Council considered not just the *Katie Ann* in the context of maintaining a directed cod fishery, but the sector as a whole and its historic use. As the Secretary points out, however, ample rational and scientific reasons supported the final allocations, which reflected Fishermen's historic usage. In fact, the agency acted consistently with its original position, which had always been to allocate the AFA trawl sector between 0.9% and 3.7% and the non-AFA trawl CP sector between 12.7% and 16.2%, based on historical usage. Furthermore, the AFA trawl CP sector, with a much smaller allocation than the non-AFA trawl CP sector, was managing to maintain a directed cod fishery because it had less bycatch as a proportion of its Pacific cod fishery. Under National Standard 9, which requires bycatch to be minimized, the Council's decision to ensure the continuance of the directed cod fishery had practical conservation and management objectives, not political ones. Thus, political concerns did not predominate as they did in *Midwater Trawlers Co-operative*, 282 F.3d at 720-21, where the final agency decision was *pure* political compromise, as the agency did not engage in *any* scientific analysis.

**F**

**[12]** The AFA requires that the Council shall manage the BSAIMA in a way to protect non-AFA vessels from adverse impacts of the directed pollock monopoly. 16 U.S.C. § 1851,

note, AFA 211(a).[1] Fishermen's claims A85 has such an adverse impact because it "robs" the non-AFA trawl CP sector to benefit the AFA trawl CP sector. Before A85, the trawl CPs were one sector allocated 23.5% of the TAC. *See* 72 Fed. Reg. at 5659. The AFA itself protected the non-AFA trawl CP sector by allocating to the AFA trawl CP sector a "sideboard" limit of 6.1% of Pacific cod catch. AFA § 211(b)(2)(A). A85 effectively replaces this protection by splitting the two sectors and allocating each a set allocation, with the non-AFA trawl CP sector limited to 13.4% and the AFA trawl CP sector to 2.3%. The substance of Fishermen's argument is that A85 causes "adverse impact" as defined in 211(a) because the historic catch of the non-AFA sector was higher than its A85 allocation whereas the historic catch of the AFA sector was lower than its A85 allocation. Fishermen's argument that they were injured in violation of 211(a) ignores the fact that 211(a) as defined in the AFA permitted greater impact by the AFA sector on the non-AFA sector than A85 effectuates. The AFA-imposed sideboard permitted the AFA sector to fish for 26%[2] of the total Pacific cod of the trawl CP sector, whereas of the total post-A85 allocation, the AFA trawl CP sector had only 14.6%[3] of the total. Thus, the AFA trawl CP sector's supposed encroachment on the non-AFA trawl CP sector was actually greatly reduced by A85 as compared to the AFA itself, which is the source of rights Fishermen's would supposedly have us rely on. The question is not whether the A85 limits on AFA vessels are less restrictive than historical usage, but whether they are greater than the impact legally

---

[1]Fishermen's attempts to combine the requirements of AFA 211(a) with National Standard 4, by claiming the NMFS was required to analyze specifically any adverse impact A85 would have on the non-AFA trawl CP sector caused by benefitting the AFA trawl CP sector. As explained below, however, if anything, A85 had an adverse impact on the AFA trawl CP sector, thus, there can be no reasonable expectation that the NMFS should analyse a non-existent harm.

[2]6.1% divided by 23.5%.

[3]2.3% divided by (2.3% + 13.4%).

allowed by the AFA. They are not. Hence, A85 does not run afoul of the American Fisheries Act.

## CONCLUSION

**[13]** We are persuaded that the Secretary did not act arbitrarily and capriciously in approving Amendment A85. As we noted in *Alliance*, "[t]he Secretary is allowed, under [controlling precedent], to sacrifice the interest of some groups of fishermen for the benefit as the Secretary sees it of the fishery as a whole." 84 F. 3d at 350. Here the interests of Fishermen's were sacrificed for the benefit of the fishery as a whole, as the Secretary favored sectors that benefitted coastal Alaskan residents, and selected data that would reduce prior unintended favoritism to the non-AFA trawl CP sector, to which Fishermen's belonged.

**AFFIRMED.**

---

CLIFTON, Circuit Judge, dissenting:

The American Fisheries Act of 1998 ("AFA") granted a lucrative monopoly in pollock fishing rights to 20 vessels operating in the BSAIMA (described as "AFA trawl CP vessels"). The AFA compensated fishing vessels not favored by the pollock monopoly ("non-AFA vessels") by charging the North Pacific Council with protecting them from the monopoly's adverse effects. Specifically, the Council's Fishery Management Plans ("FMPs") must "protect other fisheries under its jurisdiction and the participants in those fisheries, including processors, from adverse impacts caused by this Act or fishery cooperatives in the directed pollock fishery." 16 U.S.C. § 1851, note, AFA § 211(a). I conclude that Amendment 85 ("A85") violates this protective mandate by directly allocating Pacific cod to the AFA sector to the detriment of the non-AFA trawl CP sector. Additionally, the Council's use

of pre-AFA data to calculate "catch history" violates National Standard 2 of the Magnuson-Stevens Act ("MSA"), a requirement that FMPs employ "the best scientific information available." 16 U.S.C. § 1851(a)(2). As a result, I respectfully dissent.

## I.   AFA § 211(a)

In A85, the Secretary and the Council abdicated their responsibility to protect non-AFA vessels by granting the already privileged AFA trawl CP sector, for the first time, a direct allocation of the total authorized catch ("TAC") of Pacific cod. That allocation was made at the expense of, among others, the non-AFA trawl CP sector, which of necessity relies more heavily on Pacific cod after being pushed out of the pollock fishery by the AFA.

Specifically, A85 grants the AFA trawl CP sector a direct allocation of 2.3% of the Pacific cod TAC — a portion well above that sector's historic Pacific cod harvest. At the same time, A85 reduces the non-AFA trawl CP sector's allocation to 13.4% of the Pacific cod TAC — a portion well below that sector's recent harvests and below even its historic average as calculated by the Council. (As discussed below, there is reason to question the Council's calculation.) The ahistoric character of the new allocations calls into question the Council's professed goal for A85 of "better reflect[ing] historic use by sector." More importantly, by any reasonable measure the new allocations adversely impact the non-AFA trawl CP sector at the same time that they benefit the sector already favored with the pollock monopoly granted under the AFA.

The majority opinion seeks to rebut this assessment of A85's adverse impact on the non-AFA trawl CP sector by comparing the 6.1% "sideboard" limit formerly imposed on the AFA trawl CP sector's Pacific cod harvest to the smaller allocation made by A85 to the AFA sector. *Supra* at 1241. That misinterprets the function of the sideboard limit, which

imposed a hard cap on the AFA trawl CP sector's harvest rather than granting it a direct allocation like the one the sector now enjoys under A85. The majority opinion's statement that "[t]he AFA-imposed sideboard permitted the AFA sector to fish for 26% of the total Pacific cod [allocated to the combined] trawl CP sector" is imprecise and misleading. *Id.* Instead, the 6.1% sideboard allowed the AFA sector to harvest no more than 26% of the combined trawl CP sector's allocation; it did not actually guarantee the AFA sector *any* fraction of the total trawl CP harvest. Prior to A85, the AFA sector and the non-AFA trawl CP sector were treated as one group, subject to a single allocation. As the Secretary acknowledges, "[p]rior to A85, the non-AFA trawl CP sector could theoretically [have] harvest[ed] the entire 23.5% allocation of the Pacific cod TAC that it shared with the AFA trawl CP sector (because the AFA trawl CP sector's 6.1% sideboard was a limit rather than an exclusive allocation)."

In fact, the AFA sector never came close to harvesting 6.1% of the Pacific cod TAC. Between 1995 and 2003, the years on which the Council based its reallocation, the AFA sector's average harvest was just 1.7% of the TAC. By contrast, the non-AFA CP trawl sector's average harvest during the 1995-2003 period was 13.6% of the TAC. The allocations assigned to those sectors by A85 are 2.3% and 13.4%, respectively. Thus, even using the range of years the Council relied on to calculate "catch history" as the basis for comparison, A85 assigned the AFA sector a share of the Pacific cod fishery *above* historic levels while curtailing the non-AFA sector's Pacific cod fishing rights *below* its historic share.

If attention is focused on the years since adoption of the AFA, A85's adverse impact on the non-AFA trawl CP sector is even worse. In post-AFA years, between 1998 and 2003, the AFA sector's average harvest of Pacific cod was just 1.5%, substantially lower than A85's allocation of 2.3%. During those years the non-AFA trawl CP sector harvested 15.7% of TAC, yet A85 allocates only 13.4% to that group.

These numbers contradict the majority opinion's conclusion that "A85 had an adverse impact on the AFA trawl CP sector" or that the non-AFA sector is complaining of a "non-existent harm." *Supra* at 1241 n.1. Instead, A85 grants the favored AFA sector the additional boon of independence from the formerly combined trawl CP sector's Pacific cod allocation with a margin for expansion beyond its historic Pacific cod harvest, and it inflicts on the non-AFA trawl CP sector an unmitigated loss of the Pacific cod market share (both allocated and actual) that sector cultivated in the years following its exclusion by the AFA from the pollock fishery. In sum, A85's redistribution of the Pacific cod TAC imposes on the non-AFA trawl CP section an adverse impact that § 211(a) requires the Council to guard against.

## II.   The Relevant History

The Council adopted the purpose of "better reflect[ing] historic use by sector" and declared "catch history" as one of three bases for determining sector allocations. Having done so, the Council was required by National Standard 2 to use "the best scientific information available" in furtherance of its stated goals. 16 U.S.C. § 1851(a)(2). Determining what time period to consider as relevant history was obviously important in evaluating historic use. The Council calculated catch history based on the years 1995 to 2003. That selection brings to mind Mark Twain's observation:

> Figures often beguile me, particularly when I have the arranging of them myself; in which case the remark attributed to Disraeli would often apply with justice and force: "There are three kinds of lies: lies, damned lies and statistics."[1]

[1]Mark Twain, *Chapters from My Autobiography*, 185 North American Review, No. DCXVIII., July 5, 1907, at 465, 471. There is doubt as to whether the attribution of the saying to Disraeli is correct.

The AFA was adopted in 1998. Prior to that time, pollock was not reserved to the chosen few fishing vessels. After the AFA changed the rules of the game by granting the AFA sector its pollock monopoly, other fishermen were required to focus on other species, notably including Pacific cod. To no one's surprise, in later years, when they couldn't catch pollock, they caught more cod. Yet the Council defined "catch history" to include several years before the AFA changed the rules.

The Council's problem statement explained its reliance on pre-AFA data by stating that

> Consideration of just three or four recent years does not show dependency of the sectors over time and may be unduly biased because of increased market demand for Pacific cod in recent years for some products, potential decreased participation due to BSAI crab rationalization, and the likelihood of competition for Pacific cod among sectors in anticipation of this action.

But these post-AFA market stimuli should make pre-AFA data less, not more, useful in reallocating Pacific cod going forward. Most importantly, the passage of the AFA in 1998 forced the non-AFA trawl CP sector to expand its Pacific cod operations to compensate for its exclusion from the pollock fishery, as the TAC shares discussed above confirm. That sector is still excluded from the pollock fishery by the AFA. The fishermen cannot go back to 1995-1998 circumstances. The Council should not pretend that they can, but that is exactly what A85 does. Relying on pre-AFA data to calculate the catch history of post-AFA players, without making any effort to adjust for the impact of the AFA, is manifestly unreasonable.

The decisions of the Secretary and the Council are entitled to great deference, but that deference is not unchecked. I

would hold that in curtailing the non-AFA vessels' rights to harvest Pacific cod while expanding those rights in AFA vessels, the adoption of A85 violated § 211(a) of the AFA, and in using pre-AFA data to calculate "historic" catch it violated National Standard 2 of the MSA.