# United States Court of Appeals
## For the First Circuit

_____

No. 11-1952

JAMES LOVGREN; NEW HAMPSHIRE COMMERCIAL FISHERMEN'S ASSOCIATION;
PAUL THERIAULT; CHUCK WEIMER; DAVID ARIPOTCH; TEMPEST FISHERIES,
LTD.; GRACE FISHING, INC.; RICHARD GRACHEK; ROANOKE FISH CO.,
INC.; AMERICAN ALLIANCE OF FISHERMEN AND THEIR COMMUNITIES; NEW
BEDFORD FISH LUMPERS PENSION PLAN; ATLANTIC COAST SEAFOOD, INC.;
LYDIA & MAYA, INC.; JOHN & NICHOLAS, INC.; BERGIE'S SEAFOOD,
INC.; NORDIC, INC.; LYMAN FISHERIES, INC.; THE HOPE II, INC.;
REIDAR'S MANUFACTURING, INC.; DIAMOND DOG FISHING CORP.; ATLANTIC
ENTERPRISES, LLC; WANCHESE FISH COMPANY; EASTER JOY, INC.; LOCAL
1749 ILA, AFL-CIO, NEW BEDFORD FISH LUMPERS PENSION PLAN,

Plaintiffs,

------

CITY OF NEW BEDFORD; CITY OF GLOUCESTER,

Plaintiffs, Appellants,

v.

THE HONORABLE GARY LOCKE, Secretary of Commerce; THE NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION, (NOAA); THE NATIONAL
MARINE FISHERIES SERVICE, (NMFS); CONSERVATION LAW FOUNDATION,
INC.; JANE LUBCHENCO, Administrator of the National Oceanic and
Atmospheric Administration,

Defendants, Appellees,

------

ATLANTIC COASTAL COOPERATIVE STATISTICS PROGRAM, (ACCSP);
ATLANTIC STATES MARINE FISHERIES COMMISSION, (ASMFC),

Defendants.

_____

No. 11-1964

JAMES LOVGREN,

Plaintiff, Appellant,

------

CITY OF NEW BEDFORD; NEW HAMPSHIRE COMMERCIAL FISHERMEN'S
ASSOCIATION; PAUL THERIAULT; CHUCK WEIMER; DAVID ARIPOTCH;
TEMPEST FISHERIES, LTD.; GRACE FISHING, INC.; RICHARD GRACHEK;
ROANOKE FISH CO., INC.; AMERICAN ALLIANCE OF FISHERMEN AND THEIR
COMMUNITIES; NEW BEDFORD FISH LUMPERS PENSION PLAN; CITY OF
GLOUCESTER; ATLANTIC COAST SEAFOOD, INC.; LYDIA & MAYA, INC.;
JOHN & NICHOLAS, INC.; BERGIE'S SEAFOOD, INC.; NORDIC, INC.;
LYMAN FISHERIES, INC.; THE HOPE II, INC.; REIDAR'S MANUFACTURING,
INC.; DIAMOND DOG FISHING CORP.; ATLANTIC ENTERPRISES, LLC;
WANCHESE FISH COMPANY; EASTER JOY, INC.; LOCAL 1749 ILA, AFL-CIO,
NEW BEDFORD FISH LUMPERS PENSION PLAN,

Plaintiffs,

------

v.

THE HONORABLE GARY LOCKE, Secretary of Commerce; THE NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION, (NOAA); THE NATIONAL
MARINE FISHERIES SERVICE, (NMFS); CONSERVATION LAW FOUNDATION,
INC.; JANE LUBCHENCO, Administrator of the National Oceanic and
Atmospheric Administration,

Defendants, Appellees,

------

ATLANTIC COASTAL COOPERATIVE STATISTICS PROGRAM, (ACCSP);
ATLANTIC STATES MARINE FISHERIES COMMISSION, (ASMFC),

Defendants.

_____

No. 11-1987

JAMES LOVGREN; CITY OF NEW BEDFORD; PAUL THERIAULT; CHUCK WEIMER;
TEMPEST FISHERIES, LTD.; GRACE FISHING, INC.; ROANOKE FISH CO.,
INC.; NEW BEDFORD FISH LUMPERS PENSION PLAN; CITY OF GLOUCESTER;
ATLANTIC COAST SEAFOOD, INC.; LYDIA & MAYA, INC.; JOHN &
NICHOLAS, INC.; BERGIE'S SEAFOOD, INC.; NORDIC, INC.; LYMAN
FISHERIES, INC.; THE HOPE II, INC.; REIDAR'S MANUFACTURING, INC.;
DIAMOND DOG FISHING CORP.; ATLANTIC ENTERPRISES, LLC; WANCHESE
FISH COMPANY; EASTER JOY, INC.; LOCAL 1749 ILA, AFL-CIO, NEW
BEDFORD FISH LUMPERS PENSION PLAN,

Plaintiffs,

------

NEW HAMPSHIRE COMMERCIAL FISHERMEN'S ASSOCIATION; DAVID ARIPOTCH;
RICHARD GRACHEK; AMERICAN ALLIANCE OF FISHERMEN AND THEIR
COMMUNITIES,

Plaintiffs, Appellants,

v.

THE HONORABLE GARY LOCKE, Secretary of Commerce; THE NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION, (NOAA); THE NATIONAL
MARINE FISHERIES SERVICE, (NMFS); CONSERVATION LAW FOUNDATION,
INC.; JANE LUBCHENCO, Administrator of the National Oceanic and
Atmospheric Administration,

Defendants, Appellees,

------

ATLANTIC COASTAL COOPERATIVE STATISTICS PROGRAM, (ACCSP);
ATLANTIC STATES MARINE FISHERIES COMMISSION, (ASMFC),

Defendants.

_____

No. 11-2001

JAMES LOVGREN; CITY OF NEW BEDFORD; NEW HAMPSHIRE COMMERCIAL
FISHERMEN'S ASSOCIATION; PAUL THERIAULT; CHUCK WEIMER; DAVID
ARIPOTCH; RICHARD GRACHEK; AMERICAN ALLIANCE OF FISHERMEN AND
THEIR COMMUNITIES; NEW BEDFORD FISH LUMPERS PENSION PLAN; CITY OF
GLOUCESTER; ATLANTIC COAST SEAFOOD, INC.; REIDAR'S MANUFACTURING,
INC.; LOCAL 1749 ILA, AFL-CIO; NEW BEDFORD FISH LUMPERS PENSION
PLAN,

Plaintiffs,

------

TEMPEST FISHERIES, LTD.; GRACE FISHING, INC.; ROANOKE FISH CO.,
INC.; LYDIA & MAYA, INC., JOHN & NICHOLAS, INC.; BERGIE'S
SEAFOOD, INC.; NORDIC, INC.; LYMAN FISHERIES, INC.; THE HOPE II,
INC.; DIAMOND DOG FISHING CORP.; ATLANTIC ENTERPRISES, LLC;
WANCHESE FISH COMPANY; EASTER JOY, INC.

Plaintiffs, Appellants,

v.

THE HONORABLE GARY LOCKE, Secretary of Commerce; THE NATIONAL
OCEANIC AND ATMOSPHERIC ADMINISTRATION, (NOAA); THE NATIONAL
MARINE FISHERIES SERVICE, (NMFS); CONSERVATION LAW FOUNDATION,
INC.; JANE LUBCHENCO, Administrator of the National Oceanic and
Atmospheric Administration,

Defendants, Appellees,

------

ATLANTIC COASTAL COOPERATIVE STATISTICS PROGRAM, (ACCSP);
ATLANTIC STATES MARINE FISHERIES COMMISSION, (ASMFC),

Defendants.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Lynch, <u>Chief Judge</u>,
Torruella and Boudin, <u>Circuit Judges</u>.

─────────────

James F. Kavanaugh, Jr., with whom <u>John Farrell Folan</u> and <u>Folan & McGlone, P.C.</u>, were on brief, for plaintiffs-appellants New Bedford, MA and Gloucester, MA and Tempest Fisheries, et al.

Stephen M. Ouellette, with whom <u>Ouellette & Smith</u> and <u>Caitlin W. Delphin</u>, were on brief, for plaintiffs-appellants Rhode Island Alliance of Fishermen, New Hampshire Commercial Fisherman's Association, Richard Grachek and David Aripotch.

Patrick F. Flanigan, with whom <u>Law Office of Patrick F. Flanigan</u>, <u>Thomas Bond</u>, and <u>The Kaplan/Bond Group</u>, were on brief, for plaintiff-appellant James Lovgren.

Joan M. Pepin, Attorney, Appellate Section, U.S. Department of Justice, Environmental & Natural Resources Division, with whom <u>Ignacia S. Moreno</u>, Assistant Attorney General, <u>Robert J. Lundman</u>, <u>Andrea E. Gelatt</u>, <u>James A. Maysonett</u>, <u>Brian A. McLachlan</u>, and <u>Gene S. Martin</u>, National Marine Fisheries Service, were on brief, for the federal defendants-appellees.

Peter Shelley was on brief for defendant-appellee Conservation Law Foundation.

Eldon V.C. Greenberg, with whom <u>Garvey Schubert Barer</u> and <u>M. Pilar Falo</u>, were on brief, for Representatives Barney Frank and John Tierney, Amicus Curiae.

Arthur P. Krieger, with whom <u>Anderson & Krieger LLP</u>, were on brief, for Food & Water Watch, Inc., Amicus Curiae.

Roger Fleming, with whom <u>Erica A. Fuller</u>, <u>Stephen E. Roady</u>, and Earth Justice, were on brief, for Georges Bank Cod Fixed Gear Sector, Amicus Curiae.

─────────────

November 28, 2012

─────────────

**LYNCH, <u>Chief Judge</u>.** This case involves legal challenges to recent federal management actions taken in New England's sensitive Multispecies Groundfish Fishery. We reject the many challenges and affirm entry of summary judgment for the federal defendants.

Under the Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. §§ 1801-1884, the New England Fishery Management Council ("N.E. Council") regulates fishery resources within the federal waters off New England's coast. It does so primarily through Fishery Management Plans ("FMPs"), which it reevaluates biennially in light of the latest scientific information and congressionally imposed mandates and deadlines to prevent overfishing. Those mandates and deadlines were recently altered by the Magnuson-Stevens Fishery Conservation and Management Reauthorization Act of 2006, Pub. L. No. 109-479, 120 Stat. 3575 (2007), which introduced a suite of stringent protections for depleted fisheries.

This litigation centers on the N.E. Council's adjustments to the FMP governing the Northeast Multispecies Groundfish Fishery ("Fishery"). The N.E. Council was required by law to implement changes to the Fishery's 2004 FMP by the 2010 fishing year, taking into account both the Reauthorization Act's new protections and the results of a study conducted in 2008 on the health of the Fishery's stocks of fish. The study results showed that the situation was

worse than previously believed.  A number of groundfish stocks were overfished and subject to overfishing; only two stocks had improved since the 2004 FMP's implementation.  This trend has continued to the present.[1]

The N.E. Council adopted a new proposed groundfish FMP, Amendment 16, after 3 years' work, which included several publications in the Federal Register, eight public hearings, and receipt of numerous comments.  The federal environmental impact statement prepared for Amendment 16 acknowledged the severe economic hardships facing New England's fishing communities.

On January 21, 2010, Amendment 16 was upheld on administrative review by the National Marine Fisheries Service ("NMFS") of the National Oceanic and Atmospheric Administration ("NOAA") within the U.S. Department of Commerce.  The NMFS promulgated Amendment 16 through three related sets of regulations that, inter alia, altered and expanded the Fishery's preexisting

---

[1] On September 13, 2012, the U.S. Department of Commerce issued a formal disaster declaration for the Fishery.  The official press release recognized that "[d]espite fishermen's adherence to catch limits, several key fish stocks are not rebuilding, resulting in the expectation that further cuts to catch limits may be necessary in the 2013 fishing season . . . .  The disaster declaration makes it possible for Congress to appropriate money toward alleviating the financial hardship to fishermen caused by the fishery disaster."  Press Release, U.S. Department of Commerce, Secretary of Commerce Declares Disaster in Northeast Groundfish Fishery (Sept. 13, 2012), available at http://www.nmfs.noaa.gov/mediacenter/2012/09/13_secretary_of_commerce_declares_disaster_in_northeast_groundfish_fishery.html; see also Jess Bidgood & Kirk Johnson, U.S. Declares a Disaster for Fishery in Northeast, New York Times, Sept. 13, 2012, at A18.

"sector allocation program" and established new restrictions on fishing activities to end and prevent overfishing. These regulations took effect on May 1, 2010.

Plaintiffs then filed suit in federal court alleging that Amendment 16 conflicts with the Reauthorization Act's provisions governing "limited access privilege programs," 16 U.S.C. § 1853a, with the ten "national standards" applicable to all FMPs, id. § 1851(a)(1)-(10), and with the requirements of the National Environmental Policy Act, 42 U.S.C. § 4321 et seq. They unsuccessfully sought to enjoin implementation of Amendment 16. The district court granted summary judgment for defendants as to all claims. City of New Bedford v. Locke, No. 10-10789-RWZ, 2011 WL 2636863 (D. Mass. June 30, 2011). We affirm.

I.

Amendment 16 arose within the complicated statutory and regulatory system governing New England's federal fisheries.

A. Statutory Background: The Magnuson-Stevens Act and the National Environmental Policy Act

More than thirty years ago, in response to growing concerns about the nation's depleted fisheries, Congress adopted the Magnuson-Stevens Fishery Conservation and Management Act ("MSA"), 16 U.S.C. §§ 1801-1884, "to conserve and manage the fishery resources found of the coasts off the United States," id. § 1801(b)(1). Under the MSA, the federal government exercises "exclusive fishery management authority" over waters that are 3 to

200 nautical miles off the United States shoreline.  <u>Id.</u> § 1811(a); <u>Little Bay Lobster Co.</u> v. <u>Evans</u>, 352 F.3d 462, 464 (1st Cir. 2003). Management of territorial divisions within these waters is entrusted to eight Regional Fishery Management Councils, which are composed of state and federal fishery officials and other private individuals appointed by the Secretary of Commerce.  16 U.S.C. § 1852(a)-(b).[2]

Councils regulate fishing activities through FMPs and amendments thereto, <u>id.</u> § 1852(h)(1), which they submit to the NMFS for review, <u>id.</u> § 1853(c).  After ensuring that a proposed FMP is consistent with the MSA, its ten national standards, and any other applicable laws, <u>id.</u> § 1854(a)(1)(A), and after a statutorily designated period of public comment, <u>id.</u> § 1854(a)(1)(B), the NMFS executes a finalized FMP through regulations, <u>id.</u> § 1854(b), as it did for Amendment 16.

The National Environmental Policy Act ("NEPA"), in turn, requires federal agencies to include an environmental impact

---

[2] The Secretary's appointments to Regional Councils "must be individuals who, by reason of their occupational or other experience, scientific expertise, or training, are knowledgeable regarding the conservation and management, or the commercial or recreational harvest, of the fishery resources of the geographical area concerned."  16 U.S.C. § 1852(b)(2)(A).  The N.E. Council is currently composed of eighteen voting members -- a Regional Administrator of the NMFS, the five principal officials with marine fishery management responsibility in the member states, and twelve private individuals who are appointed by the Secretary -- as well as four non-voting members from various federal agencies.  The present membership of the N.E. Council is available at http://www.nefmc.org/staff/index.html.

statement ("EIS") for any action that "significantly affect[s] the quality of the human environment," 42 U.S.C. § 4332(2)(C), including FMPs, see Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 113 (1st Cir. 2002). An EIS must provide a "full and fair discussion of significant environmental impacts [of the intended action]" and "inform decisionmakers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment." 40 C.F.R. § 1502.1.

B.    Regulatory History: The Northeast Multispecies Groundfish Fishery

The Fishery is composed of thirteen bottom-dwelling fish species, inhabiting waters from Maine to the mid-Atlantic, which are divided for management purposes into twenty individual "stocks." Since the MSA's inception, the Fishery has faced persistent problems with overfishing and depletion of stocks.[3] In response, the N.E. Council has over the years adopted an assortment of regulatory strategies, with varying degrees of success. See, e.g., Associated Fisheries of Me., Inc. v. Daley, 127 F.3d 104, 107 (1st Cir. 1997).

---

[3] For example, in 1976, the Fishery's annual landings (i.e., pounds of fish caught) had fallen from a peak in 1965 of 288,000 tons to approximately 105,000 tons. Thereafter, the N.E. Council prohibited foreign fishing in the Fishery, 42 Fed. Reg. 13,926 (Mar. 14, 1977), which produced a temporary increase in landings. However, as U.S. vessels replaced foreign ones, problems with overfishing arose again and landings fell.

In 1985, the N.E. Council developed the Northeast Multispecies Fishery Management Plan, the Fishery's first permanent FMP, which took effect in 1986. 51 Fed. Reg. 29,642-02 (Aug. 20, 1986); see also Conservation Law Found. of New Eng., Inc. v. Franklin, 989 F.2d 54, 58 (1st Cir. 1993). The 1986 FMP established restrictions on gear and fish sizes and provided for periodic area closures. 51 Fed. Reg. at 29,647-53. Later amendments augmented these restrictions, but they proved collectively ineffective in reducing overfishing. See Associated Fisheries, 127 F.3d at 107; Conservation Law Found., 989 F.2d at 58. By the mid-1990s, the Fishery's annual landings and biomass had reached historic lows, AR[4] 019875, 019879, and significant revisions to the Fishery's management system became necessary.

1. Amendment 5 (1994): A Revised Permitting Scheme and the Days-at-Sea Effort-Reduction Program

In 1994, the NMFS approved Amendment 5 ("A5"), 59 Fed. Reg. 9872 (Mar. 1, 1994), the first in a series of amendments to the 1986 FMP that substantially altered the Fishery's management strategy.

A5 introduced two measures of present significance: a new approach to permits[5] and a Days-at-Sea management program. First,

---

[4] We will cite to information contained in the administrative record as "AR ___".

[5] Before A5, vessel owners had applied on an annual basis to receive or renew their federal multispecies permit -- a document issued by the NOAA Regional Administrator that entitled a vessel to

the Council sought to reduce total fishing activity by restricting the availability of permits, and A5 "substantially change[d] the fishing vessel permit application process." Id. at 9874. Vessel owners now applied for a permit in one of three permit classes. See id. at 9886. Each permit class was subject to eligibility criteria based largely on the fishing gear and capacity of the underlying vessel.[6] See id. at 9886-89.

Second, A5 established the Days-at-Sea ("DAS") effort-reduction program. Id. at 9873. This program attempted to curb overfishing through a series of "input" controls, or restrictions on the effort fishermen could "input" into catching fish,[7] rather

---

catch stocks within the Fishery subject to that year's management measures. To participate in the Fishery, a vessel had to have a valid multispecies permit on board at all times. See 51 Fed. Reg. 29,642-02, 29,647 (codified at 50 C.F.R. § 651.4 (1986)).

[6] For larger vessels, a "limited access multispecies permit" was required. 59 Fed. Reg. at 9886 (codified at 50 C.F.R. § 651.4 (1995)); see also Associated Fisheries, 127 F.3d at 108. Vessels had to apply for a limited access multispecies permit by December 31, 1994. Id. at 9888. The value of the permit was enhanced because A5 authorized a partial moratorium on the issuance of new permits after 1995. Id. at 9886 ("To be eligible to renew or apply for a limited access multispecies permit after 1994, a vessel must have been issued a limited access multispecies permit for the preceding year, or the vessel must be replacing a vessel that had been issued a limited access multispecies permit for the preceding year . . . .").
The two other permit classes were "hook-gear-only" and "possession-limit-only." Id. These permits were created, in part, to reduce the impact of A5's fishing restrictions for limited access multispecies permits on small and medium-sized vessels. Id. at 9874 (response to comment 4).

[7] The parties and the Fishery's regulations interchange the terms "effort" and "input" in referring to the DAS program's

-12-

than through an alternate model of "output" controls, or restrictions on the number of fish coming out of a fishery. See Medeiros v. Vincent, 431 F.3d 25, 30-31 (1st Cir. 2005) (describing "input" and "output" controls). The DAS input control program was oft-amended and yielded mixed results as to prevention of overfishing. Associated Fisheries of Me., Inc. v. Evans, 350 F. Supp. 2d 247, 249 (D. Me. 2004). While the overall biomass of the Fishery improved, certain pivotal stocks, including cod and flounder, remained acutely diminished. AR 019875, 031537.

2. Amendment 13 (2004): The First and Limited Sector Allocation Program

In March 2004, the NMFS partially approved Amendment 13 ("A13"), designed "to end overfishing and rebuild NE multispecies (groundfish) stocks," 69 Fed. Reg. 22,906, 22,906 (Apr. 27, 2004), in part building upon the DAS input control measures. A13 reduced some DAS allocations, eliminated certain exemptions, increased vessel monitoring, and announced a rebuilding strategy for the Fishery. Id.; see also Associated Fisheries, 350 F. Supp. 2d at 250. Significantly, A13 also introduced a new management system, the "sector allocation program," 69 Fed. Reg. at 22,914-15, as a partial alternative method of management.

---

restrictions on fishing (e.g., effort-based or input-based management, effort or input controls, etc.). We use the term "input" exclusively.

A13's sector allocation program allowed fishermen to choose, in lieu of fishing under the revised DAS program, to band together into voluntary, self-selecting groups or "sectors." Id. at 22,914. Each sector would receive its own allocation of either DAS or Total Allowable Catch ("TAC"). Id. Unlike a DAS allocation, a TAC allocation is an "output" control that caps the total amount of fish that may be caught in a given fishing year. See Oceana, Inc. v. Locke, 831 F. Supp. 2d 95, 102-03 (D.D.C. 2011). Under A13, both TAC and DAS allocations were held by sectors for the exclusive use of their members. See 69 Fed. Reg. at 22,945 (defining a sector as "a group of vessels that have voluntarily signed a contract and agree to certain fishing restrictions, and that have been allocated a portion of the TAC of a species, or an allocation of DAS").

The making of allocations to A13 sectors followed a formal procedure. Id. at 22,981-83. At least one year prior to the date on which it intended to begin operations, a would-be sector (or any person participating in one) had to submit a TAC or DAS allocation proposal to the Council on behalf of a group of limited access NE multispecies vessels.[8] Id. at 22,981. If approved, the Council would then initiate a framework adjustment to

_____

[8] A limited access NE multispecies vessel is a vessel that has been issued and is fishing pursuant to a limited access NE multispecies permit, a modified version of the limited access permit established by A5. 69 Fed. Reg. at 22,946.

authorize a TAC or DAS allocation to a sector based on the fishing history of its members.[9]  Id.  Finally, after approval and allocation, a sector would submit its own binding management plan, detailing how its members would each fish the sector's allocation. Id. at 22,982.  These plans were subject to "solicitation of public comment and consultation with the Council,"  id. at 22,929 (response to comment 64), and  sector participants were required to possess a Letter of Authorization, issued by the NMFS, evidencing their sector affiliation,  id. at 22,982-83.  Amendment 16, as described below, modified the timing of some steps in this process.

The impact of A13's adoption of sector management was at least twofold.  First, sectors offered fishermen a degree of flexibility in adjusting to "increasing restrictions imposed to rebuild groundfish stocks." Id. at 22,944.  Because sectors fished their allocations to their liking, sector participants could remain economically viable by "pool[ing] harvesting resources and consolidat[ing] operations in fewer vessels if they desire[d]." Id. at 22,943.

Second, sectors allowed participating fishermen to protect themselves from reductions in annual allocations.  While sector members were jointly and severally liable for their own

---

[9] A sector's allocation was based on an average of the cumulative fishing histories of its members, as reported by those members to the NMFS, during the 5-year period prior to submission of the proposal.  See id. at 22,981.

overfishing, id. at 22,982, they were immune from "reductions of catch or effort as a result of the actions of vessels outside [their] sector," id. at 22,943. This encouraged stewardship and self-policing among sector members and reduced the need for intervention by the Council and NMFS. Id. at 22,914.

A13 approved one sector, the Georges Bank Cod Hook Gear Sector, id. at 22,914-15, and a second, the Georges Bank Cod Fixed Gear Sector, was approved in 2006, see 71 Fed. Reg. 62,156, 62,165 (Oct. 23, 2006). Both opted for a TAC allocation.

In 2009, these sectors represented approximately 50 of the Fishery's 700 active fishing vessels. AR 052784. The remainder of the Fishery's vessels chose to continue fishing under a more restrictive version of the DAS input control program and were subject to the restrictions attached to their permit class. AR 047761, 052784.

3. Amendment 16 (2006 - Present): A Shift Away from Input-Based Management

On November 6, 2006, the N.E. Council published a notice of intent to begin preparing Amendment 16 ("A16"), 71 Fed. Reg. 64,941, the subject of this litigation. The notice stated that, "[i]n addition to considering adjustments to the current effort control management system," A16 might introduce "other management systems" to "replace or supplement" the existing scheme. Id. at 64,942. Measures under consideration included expansion of the sector program as well as an "individual quota system[]." Id.

-16-

The notice proposed an implementation date for A16 of May 1, 2009, or the start of the 2009 fishing year. Id. at 64,943. Two months later, however, Congress passed the Reauthorization Act, and the Council delayed its preparations so that A16 could meet the newly imposed congressional requirements.

C.    The Magnuson-Stevens Reauthorization Act

On January 12, 2007, the Reauthorization Act took effect. See 2007 U.S.C.C.A.N. S83 (Jan. 12, 2007). The Reauthorization Act established new conservation mandates for all FMPs. FMPs were now required to include "annual catch limits" ("ACLs") that were set at a level "such that overfishing does not occur in the fishery," as well as "measures to ensure accountability" ("AMs") to these limits. 16 U.S.C. § 1853(a)(15). Reflecting Congress's intent to increase the role of science in fishery management, proposed ACLs could "not exceed the fishing level recommendations of [a council's] scientific and statistical committee or the peer review process." Id. § 1852(h)(6).[10]

Congress also added a section to the MSA governing the implementation of new "limited access privilege programs," or LAPPs. 16 U.S.C. § 1853a. Unlike with the Reauthorization Act's mandatory ACLs and AMs, councils were not required to adopt LAPPs in managing fisheries within their jurisdiction. Id. § 1853a(a).

---

[10] In the House Report, Congress described the increased role of science under the Reauthorization Act as the Act's "most important" managerial tool. H.R. Rep. No. 109-567, at 23 (2006).

However, councils that chose to develop a LAPP through an FMP had to incorporate certain protections elaborated in section 1853a. Most of section 1853a's requirements applied to all councils, e.g., id. § 1853a(b)(1), (5), but Congress both imposed a unique requirement on the N.E. Council and created a unique exception to that requirement. The N.E. Council could not adopt an "individual fishing quota" ("IFQ"), a type of LAPP, unless such a measure was first approved in a referendum by more than two-thirds of the Fishery's "eligible permit holders" and other "fishery participants," as determined by the Secretary. Id. § 1853a(c)(6)(D)(i). But Congress also exempted "sector allocation[s]" from the referendum requirement. Id. § 1853a(c)(6)(D)(vi).

Councils and the NMFS were required to implement new FMPs by the 2010 fishing year for all fisheries subject to overfishing, and by the 2011 fishing year for all others. See Pub. L. No. 109-479, Tit. I, § 104(b), 120 Stat. at 3584 (providing effective dates for 16 U.S.C. § 1853(a)(15)).

1.  A16's Development After the Reauthorization Act

In light of the Reauthorization Act's new requirements, the N.E. Council postponed its proposed implementation date for A16 from the start of the 2009 fishing year to the start of the 2010 fishing year (May 1, 2010). In the interim, in September of 2008, the Council received the results of the third Groundfish Assessment

-18-

Review Meeting ("GARM III"), a scientific evaluation of the Fishery's health.  GARM III concluded that eleven of the Fishery's stocks were overfished and subject to overfishing.[11]  By comparison, GARM II, conducted in 2004, identified seven such stocks.  AR 018986-87, 022347.  The scientific results of GARM III had to be given weight in the development of A16.

On April 24, 2009, after eight hearings at which public comments were received, and over forty additional meetings, the N.E. Council published a draft EIS analyzing measures under consideration for A16, 74 Fed. Reg. 18,705 (Apr. 24, 2009), with comments due by June 8, 2009.  In June 2009, the Council adopted its final measures for A16[12] and submitted the plan to the NMFS for review and approval.  The NMFS published a notice of availability for that version of A16, along with its final EIS, on October 23, 2009, 74 Fed. Reg. 54,773 (Oct. 23, 2009), with comments due by December 22, 2009.  On December 31, 2009, the NMFS published a

---

[11] The MSA treats the terms "overfished" and "overfishing" synonymously.  See 16 U.S.C. § 1802(34).  However, as used by the NMFS, these terms are distinct.  A stock is "overfished" when its "biomass," or population, "has declined below a level that jeopardizes the capacity of the stock" to produce the maximum sustainable yield on a continuing basis.  A stock experiences "overfishing" when it "is subjected to a level of fishing mortality or annual total catch that jeopardizes" maximum sustainable yield. 50 C.F.R. § 600.310(e)(2)(i)(B), (E).

[12] The final vote on A16 was fourteen in favor, one opposed, and one abstention.  One council member voted against A16 on the basis of its catch allocation scheme, which we discuss in Section IV.B, below.

proposed rule which would implement the FMP recommended in A16, 74 Fed. Reg. 69,382 (Dec. 31, 2009), with comments due by January 20, 2010.

After considering all comments, the NMFS largely approved A16 and issued three related sets of regulations: (1) Amendment 16, which details A16's rebuilding program and revises existing management strategies, 75 Fed. Reg. 18,262 (Apr. 9, 2010); (2) the Sector Operations Rule, which approves seventeen additional sectors under the revised sector allocation program, 75 Fed. Reg. 18,113 (Apr. 9, 2010); and (3) Framework Adjustment 44, which establishes catch limits for each stock within the Fishery, 75 Fed. Reg. 18,356 (Apr. 9, 2010). These regulations took effect on May 1, 2010, and it is these regulations which are challenged. We group together all three under the generic term A16.

   2.   Changes Resulting from A16

Extensive revisions to the Fishery's management system were necessary to meet the Reauthorization Act's mandates to end overfishing and rebuild affected stocks. See 16 U.S.C. § 1854(e)(3). Two decades of almost exclusive input-based management had left the Fishery's stocks on the brink of collapse. The necessary scope of these revisions made some economic hardship inevitable. Recognizing this fact, the N.E. Council introduced measures to mitigate such harm to the extent they deemed practicable.

-20-

Two of A16's management measures are central to this appeal. First, consistent with the mandate of 16 U.S.C. § 1853(a)(15), A16 established new "ACLs for all stocks covered by the NE Multispecies FMP," 75 Fed. Reg. at 18,357, and AMs to ensure compliance with these limits, id. at 18,360. ACLs were set below the acceptable biological catch levels recommended by the Council's Science and Statistical Committee, and were subject to biennial adjustment based on the best available data. For certain stocks, A16's ACLs represented significant reductions from previous fishing levels. Plaintiffs do not challenge these reductions per se, but do attack defendants' decision to develop ACLs on a stock-by-stock basis.

Second, A16 altered and expanded the sector allocation program introduced by A13. To streamline the sector allocation procedure, A16 assigned every limited access permit holder a "potential sector contribution" ("PSC"), which represented a share of the new ACLs for each of the Fishery's stocks. 75 Fed. Reg. at 18,276. PSCs were assigned for each stock based on a permit holder's historic landings from 1996 to 2006, id.; this was a departure from the five-year time frame used under A13, 69 Fed. Reg. at 22,981.

Upon a permit-holder joining a sector, his or her PSC would be combined with the PSCs of other members to determine that sector's "annual catch entitlement" ("ACE"), or the maximum amount

of each fish stock that a sector's members could collectively catch. 75 Fed. Reg. at 18,276. In contrast to A13, there was no DAS alternative to ACE allocations; that choice was "[c]onsistent with the Council's intent to transition from input controls to output controls." Id. Once a sector reached its ACE, it had to cease fishing activity in that stock, id. at 18,277 with one caveat: A16 sectors could lease ACE from other sectors, subject to certain requirements, and so add to their own catch for a particular stock. Id.

Participation by permit holders in sectors remained voluntary, and permit holders who chose not to participate had an alternative: they would fish in the "common pool." Id. at 18,267, 18,275. Within the common pool, all fishing activities were governed by an amended DAS input control system. Id. at 18,268. As a result, for those who chose not to join a sector but to fish in the common pool, the PSCs assigned to those permit holders became irrelevant and played no role in regulating fishing activity. AR 047767 ("This action essentially results in the commercial groundfish fishery being managed under two different regimes: sectors and effort [input] controls.").

At the time A16 was promulgated, it was unknown who among the Fishery's permit holders would pick which option. When the sector rosters were finalized, some 812 of the Fishery's 1477 eligible permit holders had chosen to join a sector. Although this

sector choice represented only 55% of the Fishery's individual permits, these vessels were responsible for 98% of the previous decade's catch. 75 Fed. Reg. at 18,114, 18,115 tbl. 1. This was a significant change from the number of permits and catch percentage represented by sectors under A13.

## II.

There are several cases brought by different plaintiffs which were consolidated before this court on appeal. We briefly address the district court proceedings, the parties' arguments on appeal, and the governing standards of review.

### A.  District Court Proceedings

On August 3, 2010, two actions challenging aspects of A16 were consolidated in the District of Massachusetts. The first, filed by the cities of New Bedford and Gloucester (each major fishing ports) and others (collectively, "New Bedford"), alleged that A16 violated the MSA's ten national standards and the NEPA. New Bedford sought an order enjoining enforcement of A16 and requiring defendants to take certain actions. The second, filed by fisherman James Lovgren, on behalf of himself and similarly situated fishermen (collectively, "Lovgren"), advanced similar claims, but also alleged that A16 was an IFQ and that defendants had failed to conduct a referendum as required by the Reauthorization Act, see 16 U.S.C. § 1853a(c)(6)(D)(i). Lovgren sought a declaratory judgment that defendants violated the MSA and

other relief.  Defendants in both actions were the federal agencies and officials responsible for implementing and enforcing A16, including the NMFS, the NOAA, former Secretary of Commerce Gary Locke, and NOAA Administrator Jane Lubchenco.  Conservation Law Foundation ("CLF") intervened in defense of A16.

On June 30, 2011, the district court issued an order resolving cross-motions for summary judgment in favor of defendants.  City of New Bedford, 2011 WL 2636863.  Several plaintiffs moved for reconsideration, which was denied on August 17, 2011.  Four timely appeals ensued.

B.    Parties and Arguments on Appeal

Plaintiff-appellants are New Bedford (No. 11-1952), Lovgren (No. 11-1964), American Alliance of Fishermen ("American Alliance") (No. 11-1987), and others.[13]  Two Congressmen who represented New Bedford and Gloucester at the time of A16's enactment, and Food & Water Watch, Inc. ("FWW"), filed briefs amicus curiae in support of certain arguments by plaintiffs. Defendants and intervenor CLF remain as appellees.  Amicus Georges Bank Cod Fixed Gear Sector, a sector established under A13, supports A16.

Plaintiffs challenge A16 on a multitude of grounds. Taken together, the challenges fall into three broad categories:

_____

[13] Plaintiff-appellant Tempest Fisheries, LTD (No. 11-2001) did not submit its own brief, but joined in the brief of New Bedford plaintiffs.

-24-

(1) that A16's sector program is a LAPP, an IFQ, or both under the MSA, contrary to defendants' determination, and as a result, A16 was implemented without certain protections required by the Reauthorization Act's LAPP provisions, found in 16 U.S.C. § 1853a; (2) that certain features of A16 contravene several of the MSA's ten national standards; and (3) that A16 was implemented without proper consideration of reasonable alternatives and the best available information, in violation of the NEPA. Within these categories, each plaintiff asserts its own arguments, which are at times in tension with those advanced by other plaintiffs or amici. We refer to these individual arguments where such reference is helpful.

Federal defendants and CLF defend A16 against legal attack on the following bases: (1) A16 is a proper exercise of the NMFS's delegated power under the MSA because (a) no element in A16's sector program meets the elements of the statutory definition of a LAPP or an IFQ, and (b) the NMFS's interpretation of the Reauthorization Act is entitled to deference; (2) A16 is consistent with the ten national standards, and the Reauthorization Act's mandatory conservation requirements explain many of the choices said to violate those standards; and (3) the N.E. Council and the NMFS met their respective obligations under the NEPA.

C.    Standard of Review

We review the district court's grant of summary judgment de novo.  Little Bay Lobster Co., 352 F.3d at 466.  Judicial review of regulations challenged under the MSA and the NEPA is governed by the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.  See 16 U.S.C. § 1855(f); see also Associated Fisheries, 127 F.3d at 109 (MSA); Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999) (NEPA).  Our review is limited to the administrative record, Massachusetts ex rel. Div. of Marine Fisheries v. Daley, 170 F.3d 23, 28 n.4 (1st Cir. 1999), on the basis of which we may set aside an agency action only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  "Because the APA standard affords great deference to agency decisionmaking and because the Secretary's action is presumed valid, judicial review, even at the summary judgment stage, is narrow."  Associated Fisheries, 127 F.3d at 109.

We address separately each of plaintiffs' challenges.

III.

The first set of issues on appeal concerns whether the implementation of A16 is contrary to law because its sector program: (1) is a LAPP or an IFQ and does not contain the mandatory protections announced in 16 U.S.C. § 1853a; (2) is an IFQ and was not subject to approval through a referendum, id. § 1853a(c)(6)(D);

or (3) is an otherwise arbitrary or capricious exercise of the NMFS's delegated authority.

Section 1853a provides that "[a]fter January 12, 2007, a Council may submit, and the Secretary may approve, for a fishery that is managed under a limited access system, a limited access privilege program to harvest fish if the program meets the requirements of this section." Id. § 1853a(a). Defendants concede that A16 does not contain the protections set out in the remainder of section 1853a, and the parties agree that the Fishery is managed under a "limited access system." Their disagreement centers on whether the NMFS illegally concluded that the features of A16's sector program did not qualify as a LAPP, a conclusion that rendered section 1853a inapplicable.

Our analysis of an agency's interpretation of a statute proceeds in three stages. First, we assess the statutory text to determine "whether Congress has directly spoken to the precise question at issue. If so, courts, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Saysana v. Gillen, 590 F.3d 7, 12 (1st Cir. 2009) (citations omitted) (quoting Succar v. Ashcroft, 394 F.3d 8, 22 (1st Cir. 2005)) (internal quotation marks omitted). Second, if Congress's intent is uncertain, we decide whether and to what extent the agency's interpretation is entitled to deference. See Mayo Found. for Med. Educ. & Research v. United States, 131 S. Ct. 704, 712 (2011)

(resolving the parties' competing arguments on "the proper framework for evaluating [the agency's construction of] an ambiguous provision"); United States v. Mead Corp., 533 U.S. 218, 227-31 (2001). Finally, we evaluate the agency's interpretation under the governing standard to determine whether it "exceeds the bounds of the permissible." Barnhart v. Walton, 535 U.S. 212, 218 (2002).

Plaintiffs argue, for different reasons, that the analysis should end at stage one. New Bedford and American Alliance make two arguments: first, that A16's sector program meets the statutory definition of a LAPP; and second, that even if there is some technical reading on which it does not, A16's sector program should be treated as a LAPP nonetheless. This is so because, considered in its totality, the sector program is functionally, if not formally, equivalent to a LAPP.[14]

Plaintiffs assert that section 1853a's protections are important because they were designed to ameliorate the "well-known adverse effects of quota based programs." These protections, missing from A16, include: (1) restrictions on foreign participation in a LAPP, 16 U.S.C. § 1853a(c)(1)(D)-(E); (2) procedures to ensure equitable allocations of fishing privileges, id. § 1853a(c)(1)(I), (c)(5)(A); (3) limitations on excess

_____

[14] For the purposes of this argument, the parties agree that there is no meaningful distinction between a LAPP and an IFQ.

consolidation, id. § 1853a(c)(5)(D); and (4) measures to recover and minimize costs associated with LAPP formation, id. § 1853a(e). New Bedford and American Alliance submit that A16's sector program has these problematic features against which the § 1853a protections were designed and that should trigger section 1853a's corresponding protections.

Lovgren, supported by New Bedford, makes a somewhat different argument that A16 is not only a LAPP but also an IFQ, for which approval through a referendum is required.[15] The referendum requirement is found at 16 U.S.C. § 1853a(c)(6)(D)(i) and provides that:

> [T]he New England [Council] . . . may not submit, and the Secretary may not approve or implement, a fishery management plan or amendment that creates an individual fishing quota program, including a Secretarial plan, unless such a system, as ultimately developed, has been approved by more than 2/3 of those voting in a referendum among eligible permit holders, or other persons [deemed eligible to vote by the Secretary].

Importantly, there is an exemption from the referendum requirement concerning sectors, which both parties emphasize. Congress expressly stated that "[i]n this subparagraph, the term 'individual fishing quota' does not include a sector allocation." Id. § 1853a(c)(6)(D)(vi) (emphasis added).

---

[15] American Alliance acknowledges that "[t]he applicability of the referendum requirement is less clear," but it "join[s] in the arguments asserted by the other Appellants."

Federal defendants offer separate responses to these arguments. As to New Bedford and American Alliance's argument, federal defendants do not argue that the statute compels the result that A16's sector program is not a LAPP or an IFQ, but rather that their result is the most reasonable interpretation of congressional intent and that Congress entrusted to them and their considerable expertise this area of fisheries management.[16] However, with respect to Lovgren's argument, federal defendants do argue that the text Congress enacted plainly decided that A16's sectors are not IFQs for purposes of the referendum requirement.

At the first stage of analysis, for the reasons which follow, we agree with defendants that the statutory text does not compel the conclusion that A16's sector program meets the statutory definition of a LAPP or an IFQ. Rather, the text of the Reauthorization Act not only permits the NMFS's interpretation, but lends support to its reasonableness at the third stage of our analysis. Moreover, federal defendants' argument that the text does not permit the conclusion that A16's sector program is subject to the referendum requirement is correct. We reject Lovgren's argument to the contrary.

We next conclude that, at a minimum, <u>Chevron</u> deference is called for, <u>Chevron, U.S.A., Inc.</u> v. <u>Natural Res. Def. Council,</u>

---

[16] CLF takes a different position that the statutory text compels a conclusion that A16's sector program is not a LAPP.

Inc., 467 U.S. 837 (1984), and that we must defer to the agency's reasoned decision that A16's sector program is not a LAPP and is not an IFQ, Mead, 533 U.S. at 229.

A.    Clarity of the Statute

We first ask whether Congress has expressed a clear intent that the features of A16's sector program bring it within the statutory definition of a LAPP or an IFQ.  See Succar, 394 F.3d at 22.  "If Congress's intent is clear, that intent governs -- both the court and the agency must give it full effect."  Dominion Energy Brayton Point, LLC v. Johnson, 443 F.3d 12, 15 (1st Cir. 2006).

The Reauthorization Act did not define the term "limited access privilege program," but it did define a "limited access privilege."  The parties refer to both as LAPPs, and so will we.

> The term "limited access privilege" --
> (A) means a Federal permit, issued as part of a limited access system under section 1853a of this title to harvest a quantity of fish expressed by a unit or units representing a portion of the total allowable catch of the fishery that may be received or held for exclusive use by a person; and
> (B) includes an individual fishing quota; but
> (C) does not include community development quotas as described in section 1855(i) of this title.

16 U.S.C. § 1802(26) (emphasis added).  The definition of an "individual fishing quota," which was added to the MSA by the Sustainable Fisheries Act, Pub. L. No. 104-297, Tit. I, § 102, 110 Stat. 3562, 3562 (1996), differs slightly, as emphasized below:

-31-

The term "individual fishing quota" means a Federal permit under a limited access system to harvest a quantity of fish, expressed by a unit or units <u>representing a percentage</u> of the total allowable catch of a fishery that may be received or held for exclusive use by a person. Such term does not include community development quotas as described in section 1855(i) of this title.

16 U.S.C. § 1802(23) (emphasis added). The parties agree that the distinction between "limited access privileges" and "individual fishing quotas," both individually and as management programs, is largely irrelevant here. With the notable exception of the referendum requirement, which applies only to IFQs, section 1853a's protections apply equally to both LAPPs and IFQs.

In developing A16, the N.E. Council was cognizant of the Reauthorization Act's LAPP provisions. During the scoping process, the Council declined to pursue certain proposals which might raise questions about the applicability of section 1853a's protections.[17] Additionally, before settling on specific revisions to A13's sector allocation program, the Council obtained advice from the NMFS to ensure that the measures under review did not violate the terms of

---

[17] For example, one of the proposals received by the Council, and not adopted, advocated for a "points system" of management; that in turn raised the question, as the Council recognized, of whether the "points system" would be subject to section 1853a's referendum requirement. AR 005854-55. Although the Council expressed interest in evaluating the points system in future amendments, it recognized the need to eliminate overfishing and promulgate an FMP by the statutory deadline. AR 047813, 047820-22; <u>see</u> <u>also</u> Section V, below.

section 1853a, AR 051697-99, and considered public comments on the issue as well, AR 050496.

Through these deliberations, the N.E. Council and NMFS concluded that A16's sector program was not a LAPP and that section 1853a's provisions did not apply. In A16's final rule, the NMFS offered the following explanation:

> Based upon the comments received on the proposed rule for this action, there remains some confusion as to whether a sector is a limited access privilege program (LAPP), as defined in the Magnuson-Stevens Act. NMFS would like to clarify that NMFS does not consider sectors to be LAPPs, and they are not subject to the referendum or cost-recovery requirements of the Magnuson-Stevens Act. There is no permit issued to a sector, and no permanent or long-term allocation of fish is made to any sector. Unlike individual fishing quotas (IFQs), sectors are temporary, voluntary, fluid associations of vessels that can join together to take advantage of flexibilities and efficiencies that sectors are afforded. Vessel owners may choose to join a sector or not, and can change their decisions from one year to the next, based on what they believe are the best opportunities for them at that point in time.

75 Fed. Reg. at 18,275. A second discussion, appearing in the comments portion of A16's final rule, added to this reasoning that its sectors were not LAPPs because "[i]ndividual sectors are not issued a permit, they are not allocated a portion of the TAC, and

they are not clearly 'persons' eligible to hold a LAPP under [§ 1853a]."[18]  Id. at 18,292 (response to comment 49).

On appeal, defendants argue that the NMFS's conclusion that A16's sector program is not a LAPP is consistent with the statutory definition of that term and with the provisions of section 1853a.  As to the referendum requirement, defendants say the statutory language flatly precludes Lovgren's interpretation.  Plaintiffs argue that the text of the Reauthorization Act compels opposite conclusions on both fronts.  The statutory text supports the defendants.

1.  Text of the Statute: Elements in the Statutory Definition of a LAPP

Defendants' lead argument is that, under A16's sector program, "no one -- not an individual, a vessel, nor a sector -- receives" an allocation that meets each element in the statutory definition of a LAPP.  The argument has two components: first,

---

[18] Other discussions in A16's final regulations indirectly address the status of sectors vis-a-vis LAPPs and IFQs. See, e.g., Amendment 16, 75 Fed. Reg. at 18,295 (response to comment 59) ("Amendment 16 does not directly or deliberately allocate any fishing privileges . . . . Sectors themselves are merely vehicles for allowing individual fishermen to voluntarily enter into an arrangement to fish under certain exemptions to the FMP based on their individual fishing histories. Nothing in Amendment 16 . . . actually allocate[s] directly or even indirectly any new fishing privileges to individual fishermen, and, sectors themselves do not acquire any privileges that were not already in existence based on fishermen's preexisting histories."); Sector Operations Rule, 75 Fed. Reg. at 18,114 ("[B]ecause sector ACEs are temporary in nature and depend upon the collective PSCs of participating vessels, no one sector will be allocated a permanent share of any resource.").

sectors (as a whole) do not receive a "Federal permit," 16 U.S.C. § 1802(26)(A), as that term is understood in fishery management; and second, while fishermen and their vessels (individually) do receive a "Federal permit," that alone is not enough because it does not entitle them "to harvest a quantity of fish" for their "exclusive use," which are also essential elements in the definition of a LAPP. Id. These elements, not present in A16's sector program, are required in the statutory definitions of both a LAPP and an IFQ. This undercuts all of plaintiffs' section 1853a claims. We conclude that the statutory definition of a LAPP permits defendants' construction.

We start with the term "Federal permit," which has an understood meaning in fisheries management. "The understanding of a term employed by Congress is ordinarily determined as of the time of [a statute's] enactment." Hernández-Miranda v. Empresas Díaz Massó, Inc., 651 F.3d 167, 175 (1st Cir. 2011). The use of the term "permit" in the federal regulation of fisheries considerably predates the Reauthorization Act. See, e.g., United States v. Kaiyo Maru No. 53, 503 F. Supp. 1075, 1077 (D. Alaska 1980) (foreign fishing permits); Pac. Nw. Generating Coop. v. Brown, 822 F. Supp. 1479 (D. Or. 1993) (commercial fishing permits); see also Se. Fisheries Ass'n, Inc. v. Chiles, 979 F.2d 1504, 1507 (11th Cir. 1992) (noting that "[t]he fish were caught pursuant to a federal permit"). A "permit" is a document, issued by the Secretary or an

authorized federal agency, that authorizes its holder to participate in a federal fishery. See 16 U.S.C. § 1853(b) (authorizing regional councils to "require a permit to be obtained . . . [for] any fishing vessel of the United States fishing, or wishing to fish, in [federal waters] . . . [or for] the operator of any such vessel"); see also Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1379 (Fed. Cir. 2004) (noting that the MSA authorizes "regional councils to require federal permits for U.S. fishermen to fish in any fishery within [federal waters]" (citing 16 U.S.C. § 1853(b)(1))). In a fishery where a permit is required to participate, it is unlawful to fish without one or in a manner inconsistent with a permit's terms or conditions. 16 U.S.C. § 1857(1)(A)-(B).

At least since A5, there has been a highly regulated permitting system in the Fishery, see Section I.B.1, above, which remains in effect now, 50 C.F.R. § 648.4 (2012). The permits acquired under section 648.4 are issued by the NOAA Regional Administrator through a formal application process. See, e.g., id. § 648.4(a)(1)(i)(B), (I)(1)-(2) (limited access multispecies permits); id. § 648.4(a)(1)(ii) (open access permits). The class of permit a vessel holds dictates the manner in which that vessel may fish, and the issued permit must be kept on board the vessel at all times. Id. § 648.4(a)(1).

Plaintiffs acknowledge that the ACE allocation made to sectors is not a "Federal permit" under the Fishery's regulations. New Bedford argues, however, that the appropriate construction of the term "Federal permit," in relation to the LAPP requirements, is not the document described in these regulations, but the layperson's meaning of the word "permit." They offer the following dictionary definition: "1. Permission, esp. in written form. 2. A document for [sic] certificate giving permission to do something; license; warrant," American Heritage Dictionary (2d. ed. 1976), and reason that the ACE allocation made to sectors qualifies as a "Federal permit" because it is a form of permission.

There is no indication that Congress intended the term "Federal permit" to take on a layperson's notion of any permission under the Reauthorization Act when it has long had a specialized meaning. Indeed, the MSA continues to distinguish "Federal permits" from other forms of permission relating to fishing. See 16 U.S.C. § 1801(b)(7) (identifying the MSA's purpose of, inter alia, "promot[ing] the protection of essential fish habitat in the review of projects conducted under Federal permits, licenses, or other authorities" (emphasis added)).[19]

_____

[19] Other provisions in the Reauthorization Act show that where Congress intended to broaden the scope of a "permit," federal or otherwise, it did so specifically and with limiting instructions. See 16 U.S.C. § 1853a(b) (clarifying that "[l]imited access privilege, quota share, or other limited access system authorization established, implemented, or managed under this chapter -- (1) shall be considered a permit for the purposes of

New Bedford's argument to the contrary is misguided. Under traditional rules of statutory construction, "identical words used in different parts of the same [A]ct are intended to have the same meaning." Dep't of Revenue of Or. v. ACF Indus., Inc., 510 U.S. 332, 342 (1994) (quoting Sorenson v. Sec'y of Treasury, 475 U.S. 851, 860 (1986)) (internal quotation marks omitted). This is particularly true where those words are employed by Congress across multiple amendments to the same statute. See Hernández-Miranda, 651 F.3d at 175 ("The fact that Congress used the same terminology in the 1991 amendments as in [prior amendments to the Civil Rights Act] makes it quite likely . . . that it intended to adopt" the same meaning).

Here, the term "Federal permit" has been used to describe the document issued in the regulation of IFQs since the Sustainable Fisheries Act in 1996. Several fisheries in the United States had implemented IFQs before 1996 that assigned harvest privileges to fishermen and fishing vessels through a federally regulated permit. See 57 Fed. Reg. 57,130, 57,136 (Dec. 3, 1992) (Alaska Halibut IFQ program: "The annual IFQ allocation . . . would be issued to each QS holder in the form of an IFQ permit" (emphasis added)); cf. 56 Fed. Reg. 57,302-03, 57,309 (Nov. 8, 1991) (Atlantic Wreckfish ITQ

sections 1857, 1858, and 1859 of this title" (emphasis added)).

["individual transferable quota"[20]]: "Wreckfish may not be possessed on board a fishing vessel -- (i) In an amount exceeding the total of the ITQ coupons on board the vessel; (ii) That does not have on board a vessel permit for wreckfish"). The same is true of the use of permits in the regulation of current LAPPs and IFQs. See, e.g., 50 C.F.R. § 660.100 ("The [Pacific coast groundfish] trawl rationalization program creates limited access privileges," which attach to the permits described in §§ 660.111 (definitions), 660.140 (Shorebased IFQ Program), 660.150 (Mothership Coop Program), and 660.160 (Catcher/processor Coop Program)); id. § 679.4(d)(1)(i) (Alaskan EEZ sablefish and halibut IFQ permits); id. § 680.4(d) (Alaskan EEZ crab IFQ permit). This includes the N.E. Council's own IFQ program. Id. § 648.4(a)(2)(ii)(A) (Scallop IFQ permit). These programs, all developed with the same language in mind, demonstrate that defendants' construction of the term "Federal permit" is not prohibited, but entirely permissible.

Significantly, the analysis cannot end there. The term "Federal permit," as used in the statutory definition of what constitutes a LAPP, is itself subject to two limiting clauses: the permit must also be "to harvest a quantity of fish" and "for exclusive use by a person." 16 U.S.C. § 1802(26)(A). These

---

[20] An individual transferable quota, or ITQ, is identical to an IFQ except that the fishing privilege in an ITQ is transferable. See Sea Watch Int'l v. Mosbacher, 762 F. Supp. 370, 373 (D.D.C. 1991).

clauses, which also predate the Reauthorization Act, see Pub. L. No. 104-297, Tit. I, § 102, require that, to meet the definition of a LAPP, the permit must allow its recipient, and only its recipient, to catch fish. This too is consistent with the permits issued in the regulation of preexisting LAPPs, which authorize an individual or entity to harvest some portion of a fishery's TAC, but not true of A16's sector program. See, e.g., 50 C.F.R. § 679.4(d)(1)(i) ("An IFQ permit authorizes the person identified on the permit to harvest IFQ halibut or IFQ sablefish . . . until the amount harvested is equal to the amount specified under the permit . . . ."); id. § 648.53(h)(1) ("For each fishing year of the IFQ program, a vessel issued an IFQ scallop permit may only harvest and land the total amount of scallop meats allocated [to that vessel's permit] in accordance with this subpart."); id. § 660.25(e)(1)-(2) ("An MS coop [and C/P coop] permit conveys a conditional privilege to an eligible coop entity to receive and manage a coop's allocation of designated species and species groups," subject to the procedures announced in §§ 660.150 and 660.160); see also Pac. Coast Fed'n of Fishermen's Ass'n v. Locke, No. C 10-04790 CRB, 2011 WL 3443533, at *1 n.4 (N.D. Cal. Aug. 5, 2011) ("A 'limited access privilege' is a federal permit that provides a person an exclusive privilege to harvest a specific portion of a fishery's total allowable catch."); Alliance Against IFQs v. Brown, 84 F.3d 343, 345 (9th Cir. 1996) ("The basic scheme

-40-

is that any boat that fishes commercially for the regulated fish in the regulated area must have an individual quota share (IFQ) permit on board, specifying the individual fishing quota allowed for the vessel . . . .").

Plaintiffs argue that A16's PSC allocation meets both of these two additional requirements. Not so. There is no dispute that the PSC assigned to fishermen does not, by itself, allow them to catch any fish. It is only upon joining a sector that a fisherman's PSC becomes an allocation of catch. Even then, federal defendants emphasize, the quantity of fish an individual member is allowed to harvest is uncertain; sectors may assign individual members an ACE allocation according to the sector's own preferences, as expressed through a binding management plan.[21] The federal defendants' conclusion that the A16 sector program does not meet the statutory elements for a LAPP or an IFQ conforms to long-standing regulations governing fisheries and is permissible.

2. <u>The Referendum Requirement and Other Provisions in Section 1853a</u>

Turning from the definition of a LAPP/IFQ, the parties point to other provisions in section 1853a to reinforce their

_____

[21] New Bedford responds that sectors merely return the PSC allocated to individual fishermen back to them. However, this is not required by A16. How sectors choose to fish their allocation is up to them. Additionally, as New Bedford acknowledges, all sectors withhold a portion of their ACE allocation to avoid fishing overages. 75 Fed. Reg. at 18,114. This alone demonstrates that individual fishermen do not exclusively control their own allocations.

-41-

respective interpretations as to whether sectors are LAPPs or IFQs. Some of these provisions refer to the N.E. Council's "sector allocation" program directly,[22] but most offer only indirect clues as to congressional intent. Three provisions in section 1853a directly acknowledge or address the status of "sector allocations." Defendants argue that nothing in the language of section 1853a itself compels the conclusion that A16's sector program is a LAPP or an IFQ, and that sectors are plainly exempt from section 1853a's referendum requirement. We agree.

Of central importance to one portion of this appeal is section 1853a's "sector allocation" exemption from the referendum requirement, which provides that "[i]n this subparagraph, the term 'individual fishing quota' does not include a sector allocation." 16 U.S.C. § 1853a(c)(6)(D)(vi) (emphasis added). There is no dispute that Congress had A13's sector allocation program in mind when it adopted this language.

Plaintiffs argue that while the exemption may apply to A13's sectors, it does not apply to A16's sectors. They argue that A16's sectors are too qualitatively different from their

---

[22] Two provisions of section 1853a merely provide safe harbors for sector allocations -- one for sector allocations in effect before the Reauthorization Act's effective date, 16 U.S.C. § 1853a(h), and the other for sector allocations authorized up to six months thereafter (with certain exceptions), id. § 1853a(i).

predecessors to fall within the exemption. New Bedford,[23] Lovgren,[24] and FWW[25] each advance different bases for this alleged difference. Collectively, these arguments do not assist their case. The

---

[23] New Bedford argues that Congress only intended for the "sector allocation" exception to apply to sectors that shared common traits (e.g., gear, target stock, or region), like those under A13. Defendants point out that A13 explicitly did not require any commonality among sector members or vessels. A13 defined a sector as "a group of limited access NE multispecies vessels," without additional requirements, 69 Fed. Reg. at 22,981, and the EIS prepared for A13 denied that common traits were necessary. AR 000167 ("Such self-selected sectors might be based on common fishing practices, vessel characteristics, community organization, or marketing arrangements, but this would not be required." (emphasis added)). Indeed, the absence of a commonality requirement was closely related to the sector program's purpose of increasing flexibility. Id. ("Since self-selection of sector membership would not necessarily be based on any common vessel or gear characteristics this alternative offers a great deal of flexibility in the formation of sectors.").

[24] Lovgren plaintiffs emphasize that A16 did away with input-based DAS allocations, which they characterize as "the core of the sector organization [under A13]." This characterization is incorrect both in principle and as a matter of practice. First, A13 sectors could request allocations of either DAS or TAC (an "output" control), 69 Fed. Reg. at 22,981, and even A13's DAS allocations were established on the basis of "target TACs specified for the sector," id. at 22,914. Second, both of the sectors adopted prior to A16 -- to wit, those with which Congress had experience -- opted for a TAC allocation. See Section I.B.2, above.

[25] FWW argues that the introduction of PSCs under A16 is too significant a departure from A13 for the exemption to apply. But PSCs altered only the timing of allocations under the two programs, not the fundamental process. See Section I.C.3, above. Both A13 and A16 made allocations based on the average catch of a sector's members over a defined interval and assigned that allocation to sectors to be caught in accordance with their own binding management plans. PSCs expedited the allocation process by establishing, in advance, the contributions each member would make to a sector's ACE.

exclusion of sectors from the referendum requirement in section 1853a does not contain the language "identical sector allocation," "existing sector allocation," or any of the restrictions plaintiffs would read into it. There is no textual basis for the argument.

Further, the core principle, in both A13 and A16, that a sector is a voluntary "allocation proposal for a group of limited access NE multispecies vessels," 50 C.F.R. § 648.87(a)(1), remains the same. The changes made to sectors from A13 to A16 served only to enhance that core concept, not to render A16's sectors non-sectors.[26] For this reason, Lovgren's argument as to the referendum requirement is inconsistent with the text of the Reauthorization Act.

Plaintiffs' second line of argument, again not based on the statutory text, is that A16's sector program comes so close to meeting the statutory definition of a LAPP that Congress must have

---

[26] We also reject FWW's attempt to characterize the exclusion of sectors from the referendum requirement as a mere grandfathering. Congress knows how to write grandfathering clauses, see, e.g., 16 U.S.C. § 1853a(h) ("Nothing in this chapter . . . shall be construed to require a reallocation or a reevaluation of [existing programs] . . . ."), and did not use such language here.

meant for the protective measures of section 1853a to apply.[27]  The federal defendants justifiably rejected this view.

Sectors were one of several organization-based management systems in use when Congress passed the Reauthorization Act.  The text of the Reauthorization Act shows that Congress was well aware of sectors and other collective fishing programs and it chose to treat some differently than others.  Section 1853a specifically identifies two collective entities, "fishing communities" and "regional fishery associations" ("RFAs"), as eligible to participate in a LAPP, and it sets out criteria governing both.  See 16 U.S.C. § 1853a(c)(3)-(4) (fishing communities and RFAs, respectively).  In contrast, there is no comparable provision addressing the eligibility of sectors to participate in a LAPP.  Absent such an instruction, and in light of the considerable support for the NMFS's interpretation, we cannot conclude that the Act mandates the conclusion that A16's sector program is a LAPP or an IFQ.[28]

_____

[27] New Bedford and American Alliance argue that, under section 1853a, "sectors are [LAPPs] de facto, if not de jure," and that "functionally, federal permits are in fact issued both to sectors and to sector members."  Lovgren makes a similar argument that "[t]he issue of a federal permit is a red-herring" because all PSCs are attached to permits and sectors are "the summation of all PSCs."

[28] Plaintiffs also argue that the Reauthorization Act's legislative history confirms that the elements of A16's sector program are functionally if not formally equivalent to a LAPP.  It does not.  Neither the Senate nor the House Report speaks to the status of sectors or sector allocations.  Even in addressing the

B.  Administrative Deference

Having found that the Reauthorization Act does not foreclose the agency's interpretation, we turn to the issue of administrative deference.  At this stage, the parties agree that some deference is in order, but differ as to its appropriate level. Plaintiffs argue that, at most, the NMFS is entitled to Skidmore and not Chevron deference.[29]  We disagree and spell out why.

"The fair measure of deference to an agency administering its own statute has been understood to vary with circumstances . . . ."  Mead, 533 U.S. at 228.  Where it appears "that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," the

referendum requirement, no mention is given to the "sector allocation" exemption.  See S. Rep. No. 109-229, at 29-30 (2006); H.R. Rep. No. 109-567, at 88-89 (2006).  The more general remarks in the Senate Report do confirm that Congress was concerned about the "consolidation" of fishery resources that results from LAPPs, see S. Rep. No. 109-229, at 25-30, but this says little about whether A16's sector program is a LAPP or raises similar concerns to one.  "Such general remarks, when read fairly and in light of their true context, were obviously not made with this narrow issue in mind . . . ."  Jewell Ridge Coal Corp. v. Local No. 6167, United Mine Workers of Am., 325 U.S. 161, 168-69 (1945).

[29] New Bedford argues that, despite the statements that A16's sectors are not LAPPs in the final regulations, defendants made an earlier admission that sectors are LAPPs.  That is not so.  First, our focus is on A16, not on the 2007 NOAA technical memorandum from which New Bedford draws an inference that sectors are LAPPs. Second, a technical memorandum not addressed to the legal issues in this case, not subject to notice-and-comment rulemaking, and which states that it provides only "non-binding technical advice" is not an admission nor relevant to the issues before us.

agency is entitled to deference under <u>Chevron</u>.  <u>Id.</u> at 226-27.

Statutes often contain gaps, and "[f]illing these gaps . . .

involves difficult policy choices that agencies are better equipped

to make than courts."  <u>Nat'l Cable & Telecomms.</u> v. <u>Brand X Internet</u>

<u>Servs.</u>, 545 U.S. 967, 980 (2005).  Accordingly, <u>Chevron</u> requires

courts to accept an agency's gap-filling interpretation so long as

it is reasonable.  <u>Mead</u>, 533 U.S. at 229.

However, where an agency's interpretation is announced in

a manner that lacks the force of law, <u>Chevron</u> deference may be

inappropriate.  <u>See, e.g.</u>, <u>Christensen</u> v. <u>Harris County</u>, 529 U.S.

576, 587 (2000) ("Interpretations such as those in opinion letters

. . . policy statements, agency manuals, and enforcement

guidelines, all of which lack the force of law, do not warrant

<u>Chevron</u>-style deference.").  Such interpretations are generally

subject to review under <u>Skidmore</u> v. <u>Swift & Co.</u>, 323 U.S. 134

(1944), and are accorded deference in proportion to their "power to

persuade."  <u>Id.</u> at 140.

Congress has expressly delegated responsibility to NMFS

to implement FMPs through binding regulations.  <u>See</u> 16 U.S.C.

§§ 1854(a)-(c), 1855(b).  The trio of regulations implementing A16

were issued pursuant to this authority and they were subject to

extensive notice-and-comment rulemaking.  This creates a strong

presumption in favor of applying <u>Chevron</u> deference to the

challenged interpretation.  <u>See</u> <u>Doe</u> v. <u>Leavitt</u>, 552 F.3d 75, 79

-47-

(1st Cir. 2009) (noting that the Supreme Court "contemplated the application of Chevron deference to most statutory interpretations that are the fruit of notice-and-comment rulemaking").

Plaintiffs argue, however, that this presumption based on notice-and-comment rulemaking is inappropriate in this case. New Bedford, American Alliance, and FWW argue that the NMFS reached its interpretation internally, i.e., before and without the benefit of public comment. Specifically, plaintiffs rely on a September 2007 letter, identified in a single reference in A16's final rule, in which the NMFS advised the N.E. Council that section 1853a's provisions did not apply to the sector program. 75 Fed. Reg. at 18,292 (response to comment 49). Plaintiffs contend, inaccurately, that this letter, which was not subject to notice-and-comment rulemaking, was defendants' only reasoned discussion of the status of sectors and the basis for the NMFS's interpretation. We reject the argument.

As recounted earlier, the NMFS twice addressed the status of sectors in A16's final rule.[30] See Section III.A, above. The first discussion appears in the NMFS's direct overview of A16's sector program, and it does not refer to the September 2007 letter at all. 75 Fed. Reg. at 18,275. That discussion articulates the

_____

[30] The NMFS also addressed the status of sectors indirectly in other areas of A16's final regulations. See Note 18, above.

same permit-based argument presently at issue for distinguishing the ACE allocation issued to sectors from a LAPP.

It is only in the second discussion that the NMFS refers to the September 2007 letter. Even there, the agency did not rely on the letter. Instead, the NMFS clarified that it "has determined, as explained in a September 1, 2007, letter to the [N.E.] Council, that the sector program, as currently implemented in the FMP, is neither an IFQ program, nor a LAPP program." Id. at 18,292 (response to comment 49) (emphasis added). The NMFS goes on to note that "none of the revisions to the current sector program in this final rule change the conclusions reached in that letter." Id.

New Bedford next argues that even if the NMFS addressed its interpretation in A16's final rule, that was not enough: the agency should have included the discussions in A16's proposed rule, which defendants concede they did not. This argument is without basis. To the extent New Bedford is suggesting there was a lack of notice, the record is to the contrary. The issue arose several times during A16's three-year development, and public comments throughout this process indicate that the Fishery's participants, including several parties to this appeal, were aware of the Agency's position. AR 051603-04 (New Hampshire Commercial Fishermen's Association); AR 032203-05 (Lovgren); AR 050496 (FWW). Further, the N.E. Council formally announced its interpretation in

-49-

the version of A16 submitted to the NMFS for approval, which was also subject to notice and comment. See 74 Fed. Reg. 54,773 (Oct. 23, 2009). The fact that the NMFS listened to the public comments, realized some confusion remained, and stated the reasons for its views hardly shows non-compliance with the MSA, see 16 U.S.C. §§ 1854(b), 1855(d), or with notice-and-comment rulemaking. There is no basis to reject Chevron deference. Other circuits have also rejected similar arguments. See, e.g., Trout Unlimited v. Lohn, 559 F.3d 946, 954 (9th Cir. 2009) (applying Chevron deference to NMFS policy subject to "formal notice-and-comment process" (emphasis added)); Sierra Club v. U.S. Fish & Wildlife Serv., 245 F.3d 434, 440-41 (5th Cir. 2001) (same).

C.   Reasonableness of the Interpretation

Chevron directs us to defer to the agency's interpretation unless that interpretation is unreasonable. Mayo Found. for Med. Educ. & Research, 131 S. Ct. at 715. We have already explained why the record demonstrates that the NMFS engaged in reasoned decisionmaking and reached rational outcomes to hard choices. The agency has articulated a statutorily permissible basis for distinguishing A16's sector program from a LAPP, and so from compliance with section 1853a. This interpretation was reached through notice-and-comment rulemaking and conforms to over two decades of regulations governing federal fisheries.

Plaintiffs and their amici argue that regardless, A16 is unreasonable because the requirements of section 1853a should be read to protect fishermen and fishing communities from any and all management systems that might encourage consolidation or drive smaller fishing businesses out of the industry. Two points are worth making. First, whether A16's sector program in fact encourages consolidation or exerts particular pressure on small fishermen is itself disputed, and some contend that it provides greater protection against both than the alternatives. Second, defendants have opened the door to consider the concerns plaintiffs raise in their development of future FMPs. See Section V, below. In any event, "[w]hen a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy . . . the challenge must fail." Chevron, 467 U.S. at 866. Where, as here, "the regulatory scheme is technical and complex, the agency considered the matter in a detailed and reasoned fashion, and the decision involves reconciling conflicting policies," we must defer to the agency's conclusions. Id. at 865 (footnotes omitted). We reject the challenges.

IV.

Plaintiffs make a separate argument that A16 is not consistent with the MSA's ten national standards, as announced at 16 U.S.C. § 1851(a)(1)-(10), particularly Standards 1, 4 and 8.

-51-

These standards are broadly worded statements of the MSA's objectives for all fishery conservation and management measures. The purposes of the national standards are many, and can be in tension with one another. See Div. of Marine Fisheries, 170 F.3d at 30 (recognizing that "some [of the national standards] are potentially in tension with others"). Compliance with the national standards requires balancing by the agency and the exercise of discretion and judgment. See Alliance Against IFQs, 84 F.3d at 350. That being so, "we will uphold a regulation against a claim of inconsistency with a 'national standard' under § 1851 if the Secretary had a 'rational basis' for it." Or. Trollers Ass'n, 452 F.3d at 1119. "What matters is that the administrative judgment, right or wrong, derives from the record, possesses a rational basis, and evinces no mistake of law." Associated Fisheries, 127 F.3d at 111. The Secretary's judgments here were derived from the record, rational, and not based on any error of law.

A.  National Standard 1: "Overfishing" and "Optimum Yield"

The Fishery is made up of different stocks of fish, some eleven of which are badly overfished. AR 018987 (GARM III results). Under the Reauthorization Act, the N.E. Council had a two-year window to adopt an FMP that would "end overfishing immediately," 16 U.S.C. § 1854(e)(3)(A), and rebuild affected stocks in "as short [a time] as possible," id. § 1854(e)(4)(A)(i).

To meet these mandates, A16 established new ACLs, or catch limits, for each of the Fishery's stocks, at levels that the Council reasoned would rebuild most overfished stocks within four to six years. To ensure that these limits were not exceeded, A16 also provided that once an ACL was reached for a particular stock, all fishing activity in that stock had to cease. Further, any fishing overages would be subtracted from a stock's ACL in the following fishing year. See 75 Fed. Reg. at 18,267-68.

This strategy necessarily had consequences. Most fishing gear is not selective as to what it brings up and will catch a wide range of stocks. So, when the ACL for a particular stock is reached, if some incidental catch of that stock cannot be avoided in the catching of other stock, it can mean that fishing in other, healthier stocks with that gear ends too, in order to avoid depletion of the endangered stock. Defendants were candid that A16's rebuilding strategy would have these effects but concluded that such rebuilding was needed and required. See 75 Fed. Reg. at 18,365-66 (response to comment 2).

American Alliance argues that this "stock-by-stock" approach to rebuilding is inconsistent with the plain language of the MSA and is otherwise unreasonable. They rely primarily on National Standard 1 ("NS 1"), which requires that FMPs "prevent overfishing while achieving, on a continuing basis, the optimum

yield ["OY"] from each fishery."  16 U.S.C. § 1851(a)(1) (emphasis added).[31]

The potential for tension between these objectives is clear.  Challenges to the adequacy of FMPs in both respects are common; and commonly rejected.  See, e.g., San Joaquin River Grp. Auth. v. Nat'l Marine Fisheries Serv., 819 F. Supp. 2d 1077, 1102 (E.D. Cal. 2011); W. Sea Fishing Co. v. Locke, 722 F. Supp. 2d 126, 136 (D. Mass. 2010).  Plaintiffs argue that A16 improperly sacrifices optimum yield to prevent overfishing within the Fishery's weakest stocks.

American Alliance incorrectly argues that stock-by-stock management is flatly inconsistent with the plain language of the MSA.  It is true that, before 2007, the MSA had been interpreted to permit overfishing, even in depleted stocks of fish, for a limited period of time.[32]  That changed with the Reauthorization Act.  Both

---

[31] "Overfishing" is a "rate or level of fishing mortality that jeopardizes the capacity of a fishery to produce the maximum sustainable yield."  16 U.S.C. § 1802(34).  By regulation, "maximum sustainable yield" is defined as the "largest long-term average catch or yield that can be taken from a stock or stock complex under prevailing ecological, environmental conditions and fishery technological characteristics (e.g., gear selectivity)."  50 C.F.R. § 600.310(e)(1)(i)(A).  "Optimum yield," in turn, is defined as the amount of fish that "will provide the greatest overall benefit . . . particularly with respect to food production and recreational opportunities, and taking into account the protection of marine ecosystems."  16 U.S.C. § 1802(33)(A).

[32] See, e.g, Oceana, Inc. v. Evans, No. Civ. A. 04-0811 (ESH), 2005 WL 555416, at *12 (D.D.C. Mar. 9, 2005) ("Congress provided that overfishing could continue for a time [in depleted stocks] . . . ." (emphasis added));  Amendment 13, 69 Fed. Reg. at 22,920

the House and the Senate considered drafts of the Reauthorization Act that would have allowed this practice to continue. See H.R. Rep. No. 109-567, at 69; S. Rep. No. 109-229, at 113. But Congress chose instead to require all FMPs developed in overfished fisheries "to end overfishing immediately," Pub. L. No. 109-479, Tit. 1, § 104, 120 Stat. at 3584 (emphasis added) (altering 16 U.S.C. § 1854(e) "by inserting 'immediately' after 'overfishing' in paragraph (3)(A)"), and it prescribed a process for identifying these fisheries and rebuilding their stocks, see 16 U.S.C. § 1854(e)(2)-(4).

The statutory definition of "optimum yield" itself defeats Alliance's argument. See id. § 1802(33). That language notes that OY incorporates reductions based on "any relevant social, economic, or ecological factor," and "in the case of an overfished fishery, provides for rebuilding to a level consistent with producing the maximum sustainable yield in such fishery."[33] Id. § 1802(33)(B)-(C). And for each of the statutory provisions

_____

("[N]othing in the Act . . . require[s] that overfishing be ended immediately upon implementation of [an FMP] . . . ." (emphasis added)).

[33] Moreover, Congress directed the NMFS to develop advisory guidelines clarifying the requirements of NS 1, 16 U.S.C. § 1851(b), which the Agency has done, see 50 C.F.R. § 600.310. A16's stock-by-stock approach conforms to the instruction of those guidelines that "[t]he most important limitation on the specification of OY is that the choice of OY and the conservation and management measures proposed to achieve it must prevent overfishing." Id. § 600.310(b)(2)(ii) (emphasis added).

highlighted by the plaintiffs, which allegedly foreclose stock-by-stock management, there is another statutory provision which encourages or requires such management.[34] Striking the appropriate balance between NS 1's objectives is a judgment Congress both authorized and entrusted to the N.E. Council and the NMFS.[35] The only question, then, is whether the balance struck in A16 is "within the bounds of reasoned decisionmaking required by the APA." Balt. Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 104 (1983). It is.

---

[34] American Alliance points to National Standard 3 to undermine the agency's decision, but National Standard 3 does not preclude stock-by-stock management. See 16 U.S.C. § 1851(a)(3) ("To the extent practicable, an individual stock of fish shall be managed as a unit throughout its range, and interrelated stocks of fish shall be managed as a unit or in close coordination." (emphasis added)). There are also additional provisions in the MSA requiring councils and the NMFS to rebuild affected stocks. See, e.g., id. § 1851(a)(8) ("Conservation and management measures shall, consistent with the conservation requirements of this chapter (including the prevention of overfishing and rebuilding of overfished stocks), take into account . . . ." (emphasis added)); id. § 1853(a)(1)(A) (requiring FMPs to contain measures necessary to "to prevent overfishing and rebuild overfished stocks" (emphasis added)).

[35] The statement of general views by a single Congressman, 152 Cong. Rec. H9233 (daily ed. Dec. 8, 2006) (statement of Rep. Young (R-AK)), does not undermine the Reauthorization Act's explicit instruction that FMPs end overfishing immediately. See Chrysler Corp. v. Brown, 441 U.S. 281, 311 (1979) ("The remarks of a single legislator . . . must be considered with the Reports of both Houses and the statements of other Congressmen . . . ."); see also Garcia v. United States, 469 U.S. 70, 76 (1984) ("Committee reports are 'more authoritative' than comments from the floor . . . ." (quoting United States v. O'Brien, 391 U.S. 367, 385 (1968))). Furthermore, Congressman Young's comments stressed the need for balance and flexibility in meeting NS 1's requirements; they do not state that stock-by-stock management is impermissible.

Defendants were well aware that earlier measures, including effort controls, trip limits, and other restrictions, had proven ineffective, and they concluded that A16 would better address the needs of depleted stocks while conforming to NS 1's requirements. See 75 Fed. Reg. at 18,266, 18,270, 18,284 (response to comment 17). Defendants also acknowledged the problems that A16's rebuilding strategy would create for healthier stocks and took several other measures to achieve optimum yield for different stocks. For example, A16 increased access to haddock, a healthy stock, by reducing the minimum size of the allowable catch. 75 Fed. Reg. at 18,274. It also introduced new "special access programs," which relied on gear, area, and seasonal restrictions to direct fishing efforts toward healthier fish populations. Id. at 18,307. In conjunction with the expanded sector program, these efforts were meant to mitigate the short-term impact of A16's low ACLs until overfished stocks were rebuilt. See 75 Fed. Reg. at 18,365-66. Even so, some constraints were "inevitable and unavoidable due to Magnuson-Stevens Act mandates and national standards." Id. at 18,365.

B. National Standard 4: "Fair and Equitable" Allocations

For most stocks, A16 allocated TAC to segments of the Fishery according to their historical landings from 1996 to 2006. 75 Fed. Reg. at 18,276. There were two departures from this general rule: (1) sectors established before A16 continued to

-57-

receive allocations of Georges Bank cod under A13's five-year baseline, see id.; 69 Fed. Reg. at 22,981; and (2) the recreational and commercial divisions of the Fishery received allocations of Gulf of Maine cod and haddock based on their reported landings from 2001 to 2006, 75 Fed. Reg. at 18,276. American Alliance argues that these two allocations were not "fair and equitable," and so were in violation of National Standard 4 ("NS 4").[36]

"The National Standards do not require any particular outcome with respect to allocations; rather, they provide a framework for the Council's analysis." Fishermen's Finest Inc. v. Locke, 593 F.3d 886, 896 (9th Cir. 2010). Within this framework, the mandate that allocations be "fair and equitable" does not predominate over other considerations announced in NS 4 and in the remaining national standards. See Alliance Against IFQs, 84 F.3d at 348 ("[T]he Secretary's duty was not solely limited to allocating [catch] . . . fairly and equitably among the fishermen."). NS 4's advisory guidelines provide that an allocation is "fair and equitable" where it is "justified in terms of the objectives of the FMP" and serves to "maximize overall benefits." 50 C.F.R. § 600.325(c)(3)(i)(A)-(B). An allocation

---

[36] National Standard 4 provides: "If it becomes necessary to allocate or assign fishing privileges among various United States fishermen, such allocation shall be (A) fair and equitable to all such fishermen; (B) reasonably calculated to promote conservation; and (C) carried out in such manner that no particular individual, corporation, or other entity acquires an excessive share of such privileges." 16 U.S.C. § 1851(a)(4).

that meets these requirements is rarely deemed invalid.  See Ace Lobster Co. v. Evans, 165 F. Supp. 2d 148, 179-81 (D.R.I. 2001) (collecting cases).  So too, here.

The NMFS explained that maintaining the TAC baseline under A13 for preexisting sectors was necessary to promote stability and to encourage continued sector participation.  75 Fed. Reg. at 18,294 (response to comment 56) (explaining that continued use of A13's allocation time frame "was adopted to preserve the business plans developed by participants in those existing sectors and to maintain the value of investments in permits made by such participants"); AR 045955 (noting that A16 balanced the need for a fair and equitable allocation amongst all sectors against the Council's "stated interest in promoting stability in the fishery and fostering an environment where sectors can create efficient and effective business plans").  That American Alliance disagrees with this rationale does not make it an unreasoned judgment.

The second challenge, to the recreational allocation, was also addressed in A16's final regulations: "[t]he use of the more recent time period . . . reflects the Council's consideration of the potential inaccuracy of recreational catch data in earlier years and the current conditions in the fishery."  75 Fed. Reg. at 18,290 (response to comment 43).  The district court noted that the inaccuracy of the data from 1996 to 2001 is "not in dispute, and it provides a rational justification for the Agency's decision" to use

more recent data instead. City of New Bedford, 2011 WL 2636863, at *7. We agree.

C.   National Standard 8: Economic and Social Harms

All parties acknowledge that the Reauthorization Act's requirements and A16 will result in some economic and social harm. The final EIS for A16 ("FEIS") explicitly addressed the economic and social harms that would flow from A16 and the relationship between these harms and the proposed management measures. New Bedford alleges that this analysis, which is set forth in roughly 300 pages in the FEIS, was inadequate under National Standard 8 ("NS 8"). Not so.

NS 8 requires that FMPs "take into account the importance of fishery resources to fishing communities by utilizing economic and social data . . . in order to (A) provide for the sustained participation of such communities, and (B) to the extent practicable, minimize adverse economic impacts on such communities." 16 U.S.C. § 1851(a)(8). The plain language of NS 8 and its advisory guidelines make clear that these obligations are subordinate to the MSA's overarching conservation goals. See N.C. Fisheries Ass'n, Inc. v. Gutierrez, 518 F. Supp. 2d 62, 91-92 (D.D.C. 2007); Natural Res. Def. Council, Inc. v. Daley, 209 F.3d 747, 753 (D.C. Cir. 2000); see also 50 C.F.R. § 600.345(b)(1) ("Deliberations regarding the importance of fishery resources to affected fishing communities . . . must not compromise the

achievement of conservation requirements and goals of the FMP.").

New Bedford argues, incorrectly, that NS 8 requires defendants to separately address A16's social impact (i.e., apart from its economic impact) on each of the individual fishing communities affected by A16. The argument misapprehends both the law and the facts about what was considered. Economic and social impacts are necessarily intertwined in an FMP's consideration of a proposed action's harms. See Associated Fisheries, 127 F.3d at 116 (assessing social and economic harm collectively under Regulatory Flexibility Act); see also Fishermen's Finest, 593 F.3d at 895 (same under NS 4); Or. Trollers, 452 F.3d at 1122 (same under NS 8). The relatedness of these considerations bears out in NS 8's advisory guidelines, which do not identify any independent requirements regarding an FMP's "social" or "economic" analyses, but rather treat the two collectively. See 50 C.F.R. § 600.345(c)(1) ("FMPs must examine the social and economic importance of fisheries to communities potentially affected by management measures."); id. § 600.345(c)(4) ("The analysis should assess the likely positive and negative social and economic impacts of the alternative management measures . . . .").

The FEIS addressed the economic effects of A16 along a number of dimensions (including vessel size and gear type, home state and home port, and within sectors and the common pool), AR 048450-52, as well as the costs associated with sector formation

and the potential for vessels to remain profitable under A16's dual management systems, AR 048453-57. The FEIS concluded that "[t]he economic impacts . . . [on] communities are expected to be severe and in some cases may threaten the existence of fishing businesses in some communities." AR 047771.

The FEIS also independently considered the social impact of A16's proposed management measures. AR 048502-34; see also AR 051243-50. It permissibly built on prior knowledge from A13[37] and contained updated analysis on specific changes under A16 (e.g., the creation of new sectors, the relationship between sectors and the common pool, and the effects of ACLs and AMs). AR 048526-32.

New Bedford alleges that more was required, but it was not. The analysis required under NS 8 "is subject to a rule of reason, for study could go on forever." Little Bay Lobster, 352 F.3d at 470. "This is especially so where, as here, a plan comprises a set of new or changed restrictions designed to work as a whole . . . ." Id. "About the best a court can do is to ask whether the Secretary has examined the impacts of, and alternatives to, the plan he ultimately adopts and whether a challenged failure to carry the analysis further is clearly unreasonable . . . ." Id.

---

[37] "So long as the agency appropriately updates its analysis under National Standard No. 8, there is no reason why it must start from scratch every year." Or. Trollers, 452 F.3d at 1122.

V.

The final set of challenges alleges that the preparation of A16's EIS violated the NEPA, 42 U.S.C. § 4321 et seq., which requires that an EIS address "the environmental impact of" and "alternatives to" the action proposed, id. § 4332(C)(i), (iii), and contain "information sufficient to permit a reasoned choice" among alternatives as to their environmental consequences. Dubois v. U.S. Dep't. of Agric., 102 F.3d 1273, 1287 (1st Cir. 1996) (quoting All Indian Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th Cir. 1992)).

"Though significant," this requirement is "procedural in nature," United States v. Coal. for Buzzards Bay, 644 F.3d 26, 31 (1st Cir. 2011); it "does not mandate particular results," Robertson v. Methow Valley Citizens Council, 490 U.S. 332, 350 (1989). "So long as the environmental effects of a proposed action have been adequately identified and studied, the agency is free to weigh those effects and decide -- within the limits fixed by the APA -- that other values overbalance environmental costs." Buzzards Bay, 644 F.3d at 31.

Plaintiffs raise two challenges to the adequacy of the EIS prepared for A16, which are reviewed under a rule of reason. Associated Fisheries, 127 F.3d at 114 ("[C]ourts do not review challenges to the adequacy of an EIS under a standard of mathematical exactitude but under a . . . rule of reason . . . .");

Dubois, 102 F.3d at 1287. If "the agency has taken a 'hard look' at environmental consequences," the EIS will stand. Kleppe v. Sierra Club, 427 U.S. 390, 410 n.21 (1976); Buzzards Bay, 644 F.3d at 31.

New Bedford and FWW argue that federal defendants did not "adequately analyze a full spectrum of alternative management measures" in A16's EIS. Specifically, they assert that the N.E. Council and NMFS failed to consider a number of alternatives, including a "points system" proposed by the public, to the revised sector program. For several reasons, this argument fails.

As the Supreme Court said in Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519 (1978), "the concept of alternatives must be bounded by some notion of feasibility." Id. at 551. Based on practical considerations and the "purpose and need" for the proposed action, the agency must first decide which alternatives are "reasonable," 43 C.F.R. § 46.420(b), and only "reasonable alternatives" are subject to rigorous and objective review, id. § 46.420(c). See Theodore Roosevelt Conservation P'ship v. Salazar, 661 F.3d 66, 72 (D.C. Cir. 2011). For all others, the agency need only "brief[ly] discuss[] . . . the reasons for eliminating them." 43 C.F.R. § 46.420(c).

The primary purpose of A16 was "to meet all the requirements of the Magnuson-Stevens Act," AR 047816, including

-64-

its mandate to end overfishing by the 2010 fishing year. From the outset of A16's development, the Council and NMFS assessed the viability of several alternatives in relation to this objective, including: (1) the "points system"[38] and other catch-share programs (i.e., ITQs and IFQs), AR 047822; (2) various effort-based strategies, AR 047977; and (3) the "no-action" alternative, AR 047773. The Council concluded that some of these alternatives could not be implemented before the statutory deadline, while others were unlikely to end overfishing altogether. Because these alternatives were "infeasible, ineffective, or inconsistent with the basic policy objectives" of A16, N. Alaska Envtl. Ctr. v. Kempthorne, 457 F.3d 969, 978 (9th Cir. 2006) (quoting Headwaters, Inc. v. Bureau of Land Mgmt., 914 F.2d 1174, 1180 (9th Cir. 1990)) (internal quotation marks omitted), further explanation was not required.

New Bedford and FWW respond that the Council and NMFS should have delayed any major revisions until adequate alternatives could be evaluated, despite the statutory deadline. The Council and NMFS complied with the statute and acknowledged in A16's EIS that additional alternatives would be considered in future

---

[38] Defendants' consideration of the "points system" was particularly expansive. Discussions of the "points system" began in December of 2006 and continued until at least January of 2009. All told, the Council addressed the "points system" in some capacity on upwards of forty occasions during this period. See, e.g., Note 17, above.

amendments.  AR 047822 (delaying further consideration of the "points system" until Amendment 17).  The NEPA did not require more.[39]

American Alliance argues that defendants failed to take a "hard look" at the potential effects its adoption of sectors would have on consolidation in the Fishery.  The argument relies on a document outside the administrative record, but in defendants' possession at the time A16 was being developed, that discussed the effects of permit-stacking and leasing programs on fleet consolidation.[40]  Alliance argues that defendants ignored information contained in this document suggesting that sectors would increase consolidation, and that they failed to adequately address public concerns on the matter.

---

[39] FWW makes a second and incorrect argument that the remainder of the alternatives analysis in A16's EIS is inadequate.  The N.E. Council and NMFS considered several alternatives to the proposed measures outside the sector framework, AR 047951-52 (DAS System), AR 047969-70 (recreational sector), AR 047972-75 (AMs), and many more within it, AR 047941-51.  The information contained in these discussions was "sufficient to permit a reasoned choice," Dubois, 102 F.3d at 1287 (quoting All Indian Pueblo Council, 975 F.2d at 1444), and satisfied defendants' obligations.

[40] The document in question is a literature review prepared by an NOAA social scientist for Amendment 15 to the Scallop Fishery's FMP.  Its findings are incorporated in the Scallop Committee's Discussion Documents, #9a: Environmental Impacts, § 1.5.2, at 93-103, available at http://www.nefmc.org/scallops/ council_mtg_docs/Sept%202009/scallop_council_docs_sept09.htm. Alliance acknowledges that the review was not contained in the administrative record but submits it satisfies the criteria for inclusion.  See Northcoast Envtl. Ctr. v. Glickman, 136 F.3d 660, 665 (9th Cir. 1998).  Whether the document is included or excluded, our outcome would be the same.

Defendants, however, did take a hard look at consolidation in A16's EIS and addressed its interaction with the revised sector program. The information available on the degree and causes of consolidation was, by all accounts, imperfect; existing data on consolidation came from A13's sector program, which was more limited in scope, and accurate projections of future consolidation were difficult because the rosters for sectors were not finalized. AR 048464; see also Section I.C.2, above. Nonetheless, the Council conducted a cost-benefit analysis and concluded that the efficiency gains offered by sector participation outweighed the costs associated with sector formation. AR 048645. And so, while some consolidation was unavoidable due to the restrictions mandated by Congress, sectors remedied rather than contributed to this problem. AR 048618-19.

That Alliance disagrees with this conclusion is not a basis for deeming it invalid. The NEPA ensures that an informed decision is made, not that the decision is satisfactory to all those affected by it. See Buzzards Bay, 644 F.3d at 31. Defendants add that the Council is currently developing Amendment 18 to the Groundfish FMP, which addresses over-consolidation concerns directly. See Notice of Intent to Prepare an EIS and Notice of Public Scoping Meetings, 76 Fed. Reg. 79,153-02 (Dec. 21, 2011) ("This action is necessary to provide analytical support for an amendment . . . examining potential rules to reduce the

likelihood that groundfish permit holders will acquire or control excessive shares of fishing privileges in the fishery and that over-consolidation will occur within the fleet.").

VI.

We reject all of the challenges to A16 and affirm entry of judgment for defendants.  So ordered.